(C. D. 698)

ALBERTO VALES *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 29, 1942)

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Joseph E. Weil* and *Alfred A. Taylor, Jr.*, special attorneys), for the defendant.
*William Whynman* as *amicus curiae.*

Before TILSON, KINCHELOE, and DALLINGER, Judges; TILSON, J., concurring

KINCHELOE, Judge: This suit by plaintiff against the United States is for the recovery of certain customs duty alleged to have been wrongfully assessed by the collector of customs at the port of New Orleans on an importation of sisal twine. The said merchandise was assessed with duty at the rate of 40 per centum ad valorem under paragraph 1023 of the Tariff Act of 1930, as a manufacture wholly or in chief value of vegetable fiber, except cotton, not specially provided for. It is claimed by the importer to be free of duty as binding twine under the provisions of paragraph 1622 of said act, reading as follows:

PAR. 1622. All binding twine manufactured from New Zealand hemp, henequen, manila, istle or Tampico fiber, sisal grass, or sunn, or a mixture of any two or more of them, of single ply and measuring not exceeding seven hundred and fifty feet to the pound.

The merchandise in question was part of an importation invoiced as 600 bales sisal binder twine, shipped by Negociacion Mercantil S. A., of Merida, Mexico, to Alberto Vales, of New Orleans, for account of said shippers. According to the red-ink notation of the examiner on the invoice 309 bales of the twine were returned as "white sisal" twine put up in bales of 10 balls, each ball weighing 4.385 pounds and measuring 461 feet to the pound, and as "Standard" twine put up in 10-ball bales, each ball weighing 4.573 pounds and measuring 453 feet to the pound, which appears to be the portion of the importation assessed for duty at 40 per centum ad valorem under said paragraph 1023.

The collector in his report to this court states that duty was assessed under paragraph 1023, as the twine was in balls weighing less than

5 pounds and measuring less than 500 feet to the pound, citing T. D. 40805.

The plaintiff called five witnesses in his own behalf. The first was Edwin B. Kerwin, examiner of merchandise at the port of New Orleans, who stated that it was he who examined and advisorily classified the merchandise, and also prepared the appraiser's report dated December 9, 1935. When shown certain 12 sample hanks of twine he stated that they were taken out of the importation and correctly represented the merchandise, except that in its imported condition the merchandise was in ball form, as shown by illustrative exhibit A.

At the request of counsel for the plaintiff, six of the sample hanks above referred to, representing the lighter colored or "white sisal" twine, and indicated by red tags, were marked in evidence as collective exhibit 1, and six of the hanks, representing the darker colored or "Standard" twine, indicated by green tags, were marked collective exhibit 2 (R. 9/10).

The witness Kerwin stated further that he found all the twine represented by the collective exhibits 1 and 2 to be under 500 feet to the pound, and of single ply.

Plaintiff's second witness was Paul A. Badeaux, appraiser of merchandise at the port of New Orleans. He testified that he was examiner of merchandise from 1907 to 1924, and was chief assistant appraiser from 1924 to 1932, and has been appraiser since 1932 (R. 11). This witness stated on direct examination that during the time he was examiner of merchandise, if twine like collective exhibits 1 and 2, in ball form like illustrative exhibit A, did not exceed 750 feet to the pound, and was of single-ply sisal or other hard fiber, it was advisorily classified by him as free of duty under the corresponding binding twine paragraphs of the Tariff Acts of 1909, 1913, and 1922 (R. 13). On cross-examination, however, the witness corrected himself and stated that if the twine was less than 500 feet to the pound it was not considered as binding twine, and was assessed for duty as wrapping or other twine (R. 17), and that that was the practice even before the said Treasury rulings in T. D. 40805 and T. D. 47033 (R. 23). The witness further testified that outside of the form in which illustrative exhibit B is put up, he could not tell whether it was binding twine or whether it was wrapping twine (R. 26).

The first Treasury ruling on the subject of binding twine seems to be T. D. 40805 (47 Treas. Dec. 423), dated April 14, 1925, in the form of a letter to the collector of customs, New York, from which we quote as follows:

The department concurs in the views of the appraiser that the term "binding twine," as used in paragraph 1521, is limited to such twines as are used on harvesting machines, and it also concurs in his opinion that such twine, to be free of

duty under paragraph 1521, must be a single-ply, hard-twisted twine, made from any of the fibers enumerated in paragraph 1521, or a mixture of two or more of them, must contain approximately not less than 500 feet to the pound nor more than 750 feet to the pound, and the twine (which must be oiled) put up in balls of 5 or 8 pounds each, and you are accordingly directed to assess duty upon so-called binding twine not falling within the above description at the rate of 40 per cent ad valorem, as a manufacture of vegetable fiber under paragraph 1021 of the tariff act, leaving the importers, if dissatisfied, to their remedy by protest.

In T. D. 45026 (60 Treas. Dec. 91), dated July 9, 1931, the Treasury Department modified its previous instructions (T. D. 40805) so as to further restrict binding twine to such as contained not less than 8 per centum of oil.

Plaintiff called as his next witness Manuel A. Escalante, who testified that he is in the cordage business with the firm of Compania Cordelera Mayapan, Merida, Mexico, which is one of the largest manufacturers of binding twine in Mexico, and that he has dealt in binder twine for 20 years; that he has travelled extensively throughout the United States in selling his commodity, and that he has seen binding twine used a number of times. After examining collective exhibits 1 and 2 he stated that, as imported in ball form like illustrative exhibit A, it is the type of merchandise that he knows as binding twine, which he described as follows:

It is a twine made of sisal or manila, of single ply, and measuring not more than 650 or 750 feet to the pound, and usually is made up to measure from 500 to 650 feet to the pound. Of course, there is a variation in the manufacturing. Sometimes it runs less and sometimes more. Sometimes on account of competition it is made with different variations, to obtain the lower cost of manufacturing.

The witness further testified that the imported merchandise is put up in 5- or 8-pound balls, approximately 7 inches in diameter, to fit the can of the binder. In regard to the oil content, he stated that they usually use some oil in the manufacture of the twine to make it run easier through the machine, and that practically all twine used on the machines has some oil, although he did not think it absolutely necessary; that about 6 or 8 years ago he saw binding twine used in some of the western states, and also saw it used in 1927 and 1928 in Minnesota; that in his business he sold the twine almost exclusively to the agricultural districts, where it was used on harvesting machines, and that there is no other substantial use for it.

Upon cross-examination this witness admitted that he did not see the imported merchandise upon entry; that he did not make a chemical analysis of collective exhibits 1 and 2; that he is not a chemist and did not analyze the twine that he saw in the binders in Minnesota and North Dakota; that he could not tell the oil content in collective exhibits 1 and 2 without an analysis; and that he did not measure or weigh the twine he saw in the machines in Minnesota and North Dakota; that in the manufacture of twine he adds 5 or 8 per centum

of fat or oil, but that more can be used; that there is no particular percentage; that some manufacturers use 8 and some 10 per centum (R. 44). When asked to look at the green tag on collective exhibit 2 and to read what was stated thereon about the oil content, he read: "Contains approximately 10 to 15% oil." He stated however that it is not necessary to have that percentage, and that the percentage on the tag is not necessarily the truth, and that it is not necessary to specify that on the tag. When his attention was called to the wording on the green tag "Treated against destruction by insects," he said that that was usually done, but that he did not think it absolutely necessary (R. 50). When his attention was further called to the wording on the tag "Average tensile strength 85 lbs.," he stated that the twine did not have to have that particular tensile strength to be binding twine, but that it should have at least a tensile strength of 40 pounds (R. 54, 55).

The next witness for the plaintiff was Alexander M. Crighton, who testified that he was a public warehouseman in New Orleans, and has engaged in that business for 17 years; that during that time he has handled and delivered extensively merchandise that he referred to as binder twine. When asked whether the merchandise he referred to as binder twine was similar to the samples marked collective exhibits 1 and 2 herein, he answered: "Except when it arrives it is packed in balls similar to illustrative exhibit A, and then the balls are packed in bales; 5-pound balls are packed 10 to a bale, and 8-pound balls are packed 6 to a bale." He stated further that he delivered shipments of such merchandise in Louisiana to the farming belt, Rice Belt, and also to St. Louis for final distribution, and sometimes to Omaha (R. 68). The witness admitted, however, that when he said collective exhibits 1 and 2 were similar to the merchandise he received in his warehouse as binder twine, he meant as to appearance, and that he never saw the merchandise used that he sent to the Rice Belt.

The next witness was the plaintiff himself, Alberto Vales, who stated he has been president of the National Rice Mills, at New Orleans, since 1934. He attempted to testify as to the use of the imported merchandise, but as he could not tell of the use of such merchandise at and before the enactment of the present Tariff Act of 1930, he was not further questioned by his counsel.

Albert J. Carriere, the last of plaintiff's witnesses, testified that he was a broker; that he dealt in a wholesale way with merchandise he knew as binding twine as far back as 1923. He stated that he recognized the samples marked collective exhibits 1 and 2 as samples of what he dealt in as binder twine at and prior to June 17, 1930; that he was in the Rice Belt and sold the merchandise to the rice farmer for use on machines in which there are cans of a size of about 7 inches in diameter, so that the balls of so-called binding twine would fit into

them (R. 75); that some of those balls weighed 5, and some 8 pounds. In regard to oil content, he stated that years ago binder twine contained about 4 per centum of oil, but that in later years they increased it to 8 or 10 per centum to make the twine run smoothly through the machinery, and around 1929 or 1930 it went to 15 per centum (R. 83); and that in his experience from 1923 to 1930 in selling binding twine similar to collective exhibits 1 and 2 he did not know of any other use for it except for farmers to bind the rice (R. 760).

Upon cross-examination the witness stated his knowledge of binding twine was limited to Louisiana, where he saw it used by rice farmers in harvesting rice and in sewing sacks (R. 76). He admitted that oil is necessary to make the twine usable in the harvesting machine, and that it also acts as a water repellent; that it must also contain an insect repellent; that an insecticide is an important factor in that it prevents grasshoppers and other insects from attacking the twine, and that he never saw any twine which did not contain an insecticide (R. 79, 80). The witness could not remember what the tensile strength was of the binding twine he had, nor whether it actually contained an insecticide, outside of the fact that it was supposed to have it. He then testified further as follows:

X Q. Then I ask you, how can you testify that the binder twine that you had was similar in all material respects to collective exhibits 1 and 2? Do you want to retract your statement? You said it was similar in all material respects.— A. I don't know what this——

X Q. Do you want to retract it?—A. The appearance is the same thing.

X Q. I don't care what they appeared. Is it the same in all material respects?— A. How can I tell what this has?

X Q. You can't tell?—A. No, sir.

In the case of *Geo. Wm. Rueff, Inc.* v. *United States*, T. D. 47033, certain merchandise assessed for duty as sisal twine under paragraph 1005 (b) of the Tariff Act of 1930, at 40 per centum ad valorem, was claimed free of duty as sisal binding twine under paragraph 1622 of said act. In that case the twine had been denied classification as binding twine only for the reason that it did not contain as much as 8 per centum of oil, as required by said Treasury ruling or instruction published as T. D. 40805, as up to that time it had uniformly been passed free of duty as binding twine, irrespective of whether it contained more or less than 8 per centum of oil. In sustaining plaintiff's claim under said paragraph 1622 we stated in our decision, *supra*, as follows:

The said regulation of the Secretary of the Treasury requiring all single-ply sisal twine imported 30 days after the publication of same to contain not less than 8 per centum of oil, in order to be entitled to classification as binding twine under said paragraph 1622 of the present act, irrespective of whether it otherwise fulfills all the other requirements as such, and notwithstanding that it may have been classified as such up to that time, is on its face clearly an attempt to read into the statute new or different conditions, and in effect an abridgement or

modification of the law as passed by Congress. This action of the Secretary is unquestionably a usurpation of a legislative function beyond the power of an administrative or executive officer of the Government to enact, and must be held invalid and of no effect, at least insofar as it is in contravention of the law.

\* \* \* \* \* \* \*

If the purpose of said T. D. 45026 was intended to recognize or adopt a new or different commercial practice or trade understanding with respect to binding twine in recent years, different from the past, which would exclude twine containing less than 8 per centum of oil from the tariff provision for "binding twine", testimony of any such general, definite, and uniform trade understanding throughout the United States at the time of the passage of the tariff act is entirely lacking. On the contrary, such proposition is entirely negatived by the testimony of plaintiff.

In the second case of *Geo. Wm. Rueff, Inc.* v. *United States*, decided by this court in T. D. 49151, certain sisal twine which had been returned by the appraiser as binder twine less than 475 feet to the pound was also assessed for duty under said paragraph 1005 (b) at 40 per centum ad valorem, and was claimed to be free under said paragraph 1622, as sisal binding twine, as before. In that case we stated, among other things, as follows:

The whole contention herein arises through the action of the Treasury Department in said T. D. 40805 requiring the additional factor that twine in order to be entitled to classification as binding twine "must contain approximately not less than 500 feet to the pound", from which the collector allowed a variation up to 5 per centum, making a minimum measurement for binding twine of 475 feet to the pound.

Unless it is established, of course, that twine of the kind and character in question of less than 475 feet to the pound is not chiefly used for the binding of grain, this new or additional requirement clearly is an abridgement of the law and is without legal authority on the part of the Treasury Department to enact. The Government evidently, however, has been unable to put in any evidence of such fact, and as the testimony of the plaintiff to the contrary stands uncontradicted, the case undoubtedly falls squarely within our ruling in *Geo. Wm. Rueff, Inc.* v. *United States*, T. D. 47033, 65 Treas. Dec. 740, pertaining to an importation of sisal binding twine by the same importer as in the present instance. In that case, however, classification of the merchandise as binding twine under said paragraph 1622 of the Tariff Act of 1930 was denied for the alleged reason that it did not contain at least 8 percent of oil, as required by Treasury regulation, T. D. 45026. \* \* \*.

We therefore sustained plaintiff's claim in this later case and again held said Treasury regulation, T. D. 45026, invalid for the same reasons as given in the first case of this plaintiff.

The next case on binding twine was that of the *Independent Cordage Co.* v. *United States* (3 Cust. Ct. 157, C. D. 223) wherein sisal twine containing not over 3 per centum of oil, and some even less than 2.15 per centum, was again assessed for duty under said paragraph 1005 (b) of said act of 1930, and was again claimed to be free of duty under said paragraph 1622 of said act, as sisal binding twine.

In that case the Government, over objection of counsel for plaintiff, introduced testimony for the purpose of proving commercial designa-

tion or meaning of the term "binding twine," different from the common meaning. Such testimony, briefly summarized, was to the effect that the term "binding twine" or "binder twine" in the trade of the United States on or before the date of the passage of the Tariff Act of 1930, had reference to a single-ply yarn of hard fiber for use in self-tying grain binders, made exclusively in four yardages of 500, 550, 600, and 650 feet to the pound, containing an oil content of 10 to 15 per centum, and an insecticide to prevent injury or destruction of the twine by grasshoppers and crickets, put up in either 5-pound or 8-pound balls, and packed in about 50-pound bales. Also that such commercial understanding was definite, uniform, and general throughout the United States at the time of the passage of the tariff act.

This court in its decision held that the term "binding twine" and the term "binder twine" were synonymous and interchangeable terms, and referred to the same thing, and that the provision for "binding twine" is an *eo nomine* designation by use, just as was held by the appellate court with regard to the provision for "Standard newsprint paper" in paragraph 1772 of the act of 1930 in the case of *United States* v. *Tower & Sons*, 26 C. C. P. A. 1, T. D. 49534, and that chief use must be determined as of the time of the passage of the tariff act. As the plaintiff-company however failed to prove such fact with reference to the sisal twine there involved, we overruled the claim of the plaintiff for free entry of the merchandise as binding twine, without finding it necessary to pass on the question whether the provision for "binding twine" in said paragraph 1622 was susceptible of proof of commercial understanding different from the common meaning, or whether the language "all binding twine" was to be interpreted as covering twine either commonly or commercially so known.

In the present instance the evidence of the plaintiff is very much on a par with that introduced in the *Independent Cordage Co.* case, *supra*, in that it also fails to show chief use of the twine here in question, measuring under 500 feet to the pound, on binder machines for the harvesting of grain at and prior to the enactment of the present Tariff Act of 1930.

The testimony of examiner Kerwin simply identifies the samples of the involved merchandise put in evidence as collective exhibits 1 and 2. The testimony of appraiser Badeaux, if intended to prove long-continued departmental practice of classifying merchandise like that in question as binding twine, falls short of its purpose on the witness' own statement that sisal twine less than 500 feet to the pound, although otherwise meeting all the other specifications of the tariff provisions for binding twine, was assessed for duty as wrapping twine (R. 17), and that he so advisorily classified such twine even before said Treasury regulations (R. 23/24).

The testimony of plaintiff's other witnesses in stating that collective

exhibits 1 and 2 were similar to the merchandise they knew as binding twine, except that it was in the form of balls, seems to be based entirely on the appearance of said exhibits, without any actual knowledge whatever of the number of feet to the pound, the oil content, the tensile strength, or whether or not it contained an insecticide, although plaintiff's witness Escalante stated that binding twine usually measured 500 to 650 feet to the pound (R. 31), and plaintiff's witness Carriere stated that binding twine has 10 to 15 per centum of oil to make it run easily through the machine and to make it water repellent, and that it must have an insecticide (R. 76/83).

The contention of counsel for the defendant at the trial of this case was that before twine could be brought within the specifications or limitations of paragraph 1622 it must first be shown to consist of twine commercially known as binding twine. Counsel for the plaintiff maintained, however, that any such testimony would be incompetent, immaterial, and irrelevant, for the reason that Congress has specifically defined in paragraph 1622 what it considers to be binding twine (R. 93/104).

Such objection however was overruled, and counsel for the defendant introduced the testimony of seven witnesses for the purpose of proving the commercial meaning of the term "binding twine." Among these were salesmen and sales managers of large manufacturers and dealers of cordage and binding twine, also a large grain farmer, and another farmer who was also engaged in the farm supply business. Most of these witnesses are shown to be men of long and extensive experience in the sale and manufacture of binding twine in all of the territories in which binding twine is used. Some of the witnesses also owned and operated or were familiar with the operation of binding machines. They were all referred to the definition of the term "binding twine" given in Webster's New International Dictionary, editions 1929 and 1933, reading:

binding twine. A coarse slack-twisted twine or thin rope used in harvesting machines to bind the grain after cutting.

The said witnesses all testified that the understanding of the term "binding twine" in the wholesale trade of the United States at and prior to June 17, 1930, the date of the present tariff act, was different from the common meaning as defined above, and that according to the commercial meaning binding twine was a single-ply twine made of hard fiber for use on a harvesting machine, containing 10 to 15 per centum of oil, having a tensile strength of 80 to 85 pounds, also containing an insect repellent or insecticide, and put up in 5- and 8-pound balls measuring 500, 550, 600, and 650 feet to the pound, and packed in bales of ten 5-pound balls and six 8-pound balls.

The said witnesses further testified that the trade understanding of the term "binding twine" was general, definite, and uniform

throughout the United States, and that the terms "binding twine" and "binder twine" are synonymous and interchangeable. Most of the witnesses also testified that if the twine had all the other specifications, but only a 7 per centum oil content, or was only 450 or 460 feet to the pound, or did not have a minimum tensile strength of 80 to 85 pounds, or did not contain an insect repellent or insecticide, it would not have been understood as binding twine in the wholesale trade of the United States at the time of the enactment of the present tariff act, and that it would not have been a good delivery for binding twine, and would not have been accepted as such.

The witnesses who were familiar with the operation of a binding machine stated that if the twine did not have an oil content of 10 to 15 per centum it would break in the binder, because the twine would not be sufficiently lubricated. Also, if it did not contain said amount of oil the twine would not be sufficiently waterproofed, so that if the twine became wet from rain it would frazzle and break, with the result that the grain left in the open fields would be strewn about and ruined. Some of the witnesses testified that if there was no insect repellent in the twine it would be attacked by grasshoppers and crickets, which also would cause the wheat or cereal to be blown and strewn over the fields, with heavy loss to the farmer.

The witnesses testified further that if the twine was more than 650 feet to the pound, even though it had all the other specifications, it would not only be a bad delivery, but would not be acceptable. And one of the witnesses stated that it could not be used, because proper adjustments could not be made on the binder.

As already indicated, plaintiff has failed to prove that twine of the kind or class here under consideration, i. e., in balls of less than 5 pounds and measuring under 500 feet to the pound, was on or before June 17, 1930, chiefly used on harvesting machines for the binding of grain, which in itself is fatal to plaintiff's claim under the rule of chief use as applied to *eo nomine* use designations. The testimony, however, also indicates that the involved twine does not come within the commercial meaning of the term "binding twine" as testified herein by defendant's witnesses—at least not in some respects. So, applying either the test of chief use or that of commercial designation, the result would be the same.

Under the circumstances and on the present record we can see no good reason for deviating from the rule of chief use heretofore applied, especially as use on a harvesting machine still seems to be a necessary factor in the commercial understanding of "binding twine," according to defendant's testimony.

We therefore overrule plaintiff's claim for free entry of the twine in question under said paragraph 1622 on the ground of failure of proof showing that at the time of the passage of the present tariff act such

kind or class of twine was chiefly used on harvesting machines for the binding of grain, without finding it necessary in the present instance to pass on the question whether the term "binding twine" is in fact; subject to proof of commercial designation, or whether the term "all binding twine" in said paragraph 1622 is intended to cover binding twine either commonly or commercially so known.

Judgment will be rendered accordingly.

### CONCURRING OPINION

TILSON, Judge: I concur in holding that the plaintiff has failed to establish a *prima facie* case, in that he has failed to show that the instant twine belongs to that class or kind of twine which, at or prior to the date of the passage of the act of 1930, was chiefly used for binding purposes. It is my view that the provision in paragraph 1622 for "All binding twine manufactured from * * * sisal grass * * * of single ply and measuring not exceeding 750 feet to the pound" covers and includes all twine manufactured from sisal grass of single ply and measuring not exceeding 750 feet to the pound which belongs to that class or kind of twine which, on or before the passage of the act of 1930, was chiefly used for binding purposes. This precludes proof of commercial designation and renders immaterial the oil content, the amount of insect repellent or insecticide contained therein, the tensile strength per pound and whether put up in balls measuring 500, 550, 600, or 650 feet to the pound or otherwise, all of which qualifications may be material factors in determining the chief use of the merchandise. In my opinion, under the provision in paragraph 1622 "All binding twine * * *" which answers all the other provisions of said paragraph is dutiable thereunder whether commonly or commercially known as binding twine, provided it belongs to that kind or class of twine which, at and prior to the passage of the act of 1930, was chiefly used for binding purposes.

It must be presumed that the Congress placed all the limitations upon paragraph 1622 which it intended the paragraph to bear, and it is not the province of either the Secretary of the Treasury or this court to attempt to write into the paragraph limitations which the Congress refused to enact into the same.