(C. D. 1392)

GEO. WM. RUEFF, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 25, 1952)

*Steeg & Morrison* (*James J. Morrison* of counsel); *George R. Tuttle,* associate counsel, for the plaintiff.

*Charles J. Wagner,* Acting Assistant Attorney General (*Joseph E. Weil, Richard E. FitzGibbon, Jerome Vale,* and *Richard H. Welsh,* special attorneys), for the defendant.

*William Whynman* as *amicus curiae.*

Before RAO, FORD, and JOHNSON, Judges; FORD, J., concurring

RAO, Judge:   Two importations from Mexico totaling 1,680 bales of sisal twine were classified by the collector of customs at the port of New Orleans, La., as twine, single or plied, wholly or in chief value of sisal, and assessed with duty at the rate of 20 per centum ad valorem

pursuant to the provisions of paragraph 1005 (b) of the Tariff Act of 1930, as modified by the trade agreements with the Netherlands, 69 Treas. Dec. 10, T. D. 48075, and with Mexico, 78 Treas. Dec. 190, T. D. 50797. The instant protest was filed against such classification and assessment, claiming that the merchandise was entitled to free entry under paragraph 1622 of said act as binding twine. In the alternative, and by way of amendment to the protest, it was further claimed that the imported twine was free of duty as agricultural implements, or parts thereof, within the meaning of the provisions therefor in paragraph 1604 of the Tariff Act of 1930.

At the very outset, the court commends counsel for the importer, the Government, and *amicus curiae* for the excellence of the briefs submitted by them. Their briefs have been of invaluable assistance to the court in its deliberations of the issues involved in this case.

The pertinent provisions of the Tariff Act of 1930 read as follows:

PAR. 1005. (b) Cords and twines (whether or not composed of three or more strands, each strand composed of two or more yarns), tarred or untarred, single or plied, wholly or in chief value of manila (abaca), sisal, henequen, or other hard fiber, 40 per centum ad valorem.

The rate of duty upon the articles provided for in this paragraph has been reduced to 20 per centum by the trade agreements with the Netherlands and with Mexico, *supra*.

PAR. 1604. Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, machinery for use in the manufacture of sugar, wagons and carts, cream separators valued at not more than $50 each, and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided*, That no article specified by name in Title I shall be free of duty under this paragraph.

PAR. 1622. All binding twine manufactured from New Zealand hemp, henequen, manila, istle or Tampico fiber, sisal grass, or sunn, or a mixture of any two or more of them, of single ply and measuring not exceeding seven hundred and fifty feet to the pound.

It is the contention of plaintiff herein that paragraph 1622, *supra*, in providing for all binding twine manufactured from the fibers or grasses therein specified, of single ply, and not exceeding 750 feet to the pound, should be literally construed and that any twine used for binding in harvesting operations which meets the specifications of the paragraph is included within its provisions. Hence, it is urged that the imported merchandise which is a single-ply twine, manufactured wholly from Mexican sisal, which runs less than 750 feet to the pound, and which is chiefly used to bind hay into bales, is binding twine as provided for in said paragraph 1622.

In the alternative, the argument is made that the imported twine is an agricultural implement within the broad meaning of that term as defined in *Wilbur-Ellis Co.* v. *United States*, 26 C. C. P. A. (Cus-

toms) 403, C. A. D. 47, in that it is used for binding bales of hay produced by automatic hay-baling machines, in substantially the same manner as the steel bale ties involved in the cited case were used for binding bales of hay produced by stationary hay balers. In any event, it is claimed that the twine is an integral part of an automatic hay-baler machine, without which it cannot function and, hence, that the merchandise is free of duty under paragraph 1604, *supra*, as parts of agricultural implements.

The briefs of the Government and *amicus curiae* rely principally upon the proposition that "binding twine" and "binder twine" are synonymous and interchangeable terms, citing tariff history, dictionary definitions, and the cases of *Independent Cordage Co., Inc.* v. *United States*, 3 Cust. Ct. 157, C. D. 223, and *Vales* v. *United States*, 9 Cust. Ct. 219, C. D. 698. It is urged, therefore, that since the record establishes that the imported merchandise is not binder twine, it is not binding twine as provided for in paragraph 1622, *supra*. It is also claimed that the plaintiff has failed to establish chief use of the imported merchandise, at the time of importation, in the binding of small grains.

On the issue presented by plaintiff's claim of free entry under paragraph 1604, *supra*, both briefs for the defense assert that the involved twine is a material akin to wire used for baling purposes, rather than an article comparable to a completed bale tie, and is therefore not an agricultural implement, nor parts thereof, within the meaning of paragraph 1604, *supra*.

Although 11 witnesses testified for the plaintiff in this case and 6 for the defendant, there is not a material dispute as to the facts. It appears from the record that the merchandise in question is a twine manufactured from sisal which grows in the state of Yucatan, Mexico. The manufacturer of the imported merchandise described its processing to be substantially as follows: The sisal fibers are fed into hackling machines, during which time an emulsion of mineral oil, animal greases, and insect repellent is poured over them. The fibers are then put through machines called breakers, spreaders, draw frames, and finishers from which they emerge in the form of a nonending sliver. The sliver is then spun into one-ply twine which is wound into cylinders, balls, or tubes, weighing approximately 20 pounds each. Each tube is approximately 10 inches in diameter and 13½ inches in height. At the time of importation, the twine was packed four balls to the bale. Presently, it is packed two balls to the bale.

The record establishes further that twine of the type in issue was not known to trade and commerce at or prior to June 17, 1930, the date of the passage of the present tariff act, but that it came into use in the early 1940's.

The instant twine was designed by the manufacturer to meet the requirements of the automatic hay-baler machine, a machine which packs hay into bales which are then tied with twine. Machines of this type are manufactured by the International Harvester Co. and the New Holland Machine Co. and first came into general use at or about the year 1945. Twine for these machines generally runs 200 feet to the pound, has an average tensile strength of about 240 pounds, contains approximately 12 to 15 per centum of oil by weight, and has been treated with an insect repellent which also acts as a rodent repellent. Some types of twine for these machines are also treated with a specific rodent repellent. The grease is put on the twine as a softener. The oil in the twine lubricates it and eases its passage through the hay-baler machine. It also serves as a natural protector against mildew, rot, and humidity.

It further appears that the imported twine is the same in composition, texture, and all other material respects as certain baler twine marketed under the name of "Guardsman" baler twine, although the latter, due to more experienced workmanship, is a better and more uniform product. Guardsman baler twine, which is described in defendant's exhibit 2, an advertisement, is likewise used in automatic pick-up hay-baling machines. The principle under which these machines operate was described by the witness Odell, manager of the Cordage Department of Van Waters & Rogers of Seattle, Wash., to be as follows:

A. The twine is accommodated in sort of a can dispenser, inside of the machine, and feeds through the mechanism, tying mechanism. The machine operates with a plunging device that compresses this hay in the bale or in this compartment in the machine. The twine is mechanically put around lengthwise on the bale, two strands. There are, incidentally, two tubes operating; one makes one strand and one the other, and at the time the bale reaches its capacity the mechanism trips and these two strands make it a bound bale.

The bale thus produced is a rectangular cube approximately 18 x 18 x 36 inches, weighing from 50 to 75 pounds.

The twine in issue is also similar to baler twine manufactured by the Brantford Cordage Co., Ltd., of Brantford, Ontario, except that the latter has a guaranteed tensile strength of 270 pounds, is packed in balls approximately 10 inches in diameter by 10 inches in height, runs 220 feet to the pound, and is separately treated with a rodent repellent.

It has also been established that twine used in the aforementioned automatic hay-baling machines is known as baler twine. There is, however, a machine manufactured by the Allis-Chalmers Co., described as a rotary type one-man pick-up baler called a Roto-Baler, which produces a carpet-like roll of hay around which twine is wound but not tied. The bale is circular in shape, approximately 40 inches in

length and 20 inches in diameter. This machine uses twine which is described by all the witnesses as binder twine.

There are also machines which employ wire instead of twine for the tying operation in the baling of hay. Prior to the production of the automatic self-tying machines, however, hay was baled with the use of metal bale ties and a stationary baler. Bale ties are separate pieces of metal wire, with a loop on one end and latterly a small loop on the other. They are manually poked through the compressed bale of hay before being tied.

The twine that is used to wrap bales of hay produced by automatic hay-baling machines is not cut to lengths before being used. The entire ball is placed in the machine dispenser, and appropriate lengths measured off as the bales are formed. After it is once used to tie the hay, it is ordinarily discarded. It cannot be used again for baling hay through the machine. Neither are bale ties normally used again for baling hay. They are, however, frequently used about the farm for fixing machinery and the like.

Except for its use in the Allis-Chalmers Roto-Baler, binder twine is ordinarily employed in binder machines for wrapping or tying sheaves of small grains. Binder machines cut the grain before conveying it into the machine for binding. Automatic hay-baler machines do not cut the hay. They come into operation after the hay has been cut and left in the fields in the form of windrows or swaths. Binder twine for use in binder machines is manufactured substantially the same way as is baler twine. The same machines are used and the same general treatment is accorded them, except that binder twine does not usually have the specific rodent repellent. Binder twine is packaged normally in either six 8-pound balls or 10 balls weighing slightly under 5 pounds each. It usually is either 500 feet to the pound, 550 feet to the pound, 600 feet to the pound, or 650 feet to the pound, with the variety in most prevalent use in the United States being 500 feet to the pound. It has an average tensile strength of approximately 85 to 90 pounds. It contains as a rule not less than 10 per centum of oil. In the operation of the binder machine, the general mechanism for binding the sheaf is similar to the mechanism of the baler machine for tying the hay. However, the sheaf of grain, like the rolled bale produced by the Allis-Chalmers machine, is not tied. The twine is simply wrapped around the grain. The tensile strength of baler twine is necessarily much greater than that of binder twine because the bale of hay is subjected to considerable pressure to compress it, and expansion in the fields after the bale has been made would cause a lighter twine to break. Bales of hay are normally kept from 1 to 3 years before consumption. Sheaves of grain are not usually left in the field more than 2 weeks.

It is generally agreed that baler twine cannot be used in a binder machine and that binder twine cannot be used in a baler machine,

with the exception heretofore noted, of the Allis-Chalmers machine. Generally speaking, twine for the binder machine is bought and sold and referred to by dealers and farmers alike as binder twine, although some of the witnesses for the defendant testified that they had received some inquiries about and orders for binding twine, which orders were filled with binder twine, and no returns of the merchandise were ever made. However, it is not clearly shown during what period these inquiries and orders for "binding twine" were made, nor was any specific instance of such inquiry or order referred to. Certainly, it has not been shown by the defendant that orders for binding twine were filled with binder twine at any time after baler twine came into general use.

We shall first consider plaintiff's alternative claim that the twine here involved is entitled to entry free of duty under paragraph 1604 of the Tariff Act of 1930, *supra*, as an agricultural implement or a part thereof. It would seem, in view of the decision of our appellate court in *Wilbur-Ellis Co.* v. *United States, supra,* that a distinction must be made between an article such as a bale tie, which is completely finished and ready for use in the baling of hay or other commodities, and baling wire and/or baler twine which are mere materials. This distinction was clearly pointed out in *W. J. Byrnes & Co.* v. *United States,* 30 C. C. P. A. (Customs) 166, C. A. D. 229, wherein the court stated:

In the *Wilbur-Ellis* case, *supra,* we held that the baling of hay was an agricultural pursuit and that steel bale ties, which were used in baling the hay and which were not merely material, like wire, but were completely finished articles made from wire, should properly be regarded as agricultural implements. We see a vast difference between an implement used by poultry raisers on the legs of chickens or articles made from wire and chiefly used for baling hay, on the one hand, and a chemical in tablet form chiefly used as an insecticide, on the other. Among the differences is the fact that the leg bands and bale ties are not consumed or destroyed in the process of use, as is the merchandise at bar.

While therefore steel bale ties which are completed articles are free of duty as agricultural implements, baling wire which is a mere material, rather than a finished article, cannot be termed an agricultural implement. The similarity between baling wire and baler twine in this respect is so evident that elaboration of the point is deemed unnecessary. Suffice it to say that as baler twine is a mere material, it does not fall within the tariff designation for agricultural implements.

Nor is baler twine a part of an agricultural implement. In the case of *Wilbur-Ellis Co.* v. *United States,* 73 Treas. Dec. 1008, T. D. 49626, we stated:

In our opinion binding twine is no more a part of a binder machine than thread is a part of a sewing machine. While the thread passes through the machine in the process of sewing a garment, it merely passes through the machine and becomes a part of the machine's product, to wit, the garment; and so in the present case the bale tie becomes a part of the hay bale. By no stretch of the

imagination can such a tie be considered a part of an agricultural implement or an agricultural implement itself. If they are agricultural implements, then the bale of hay which they bind is an agricultural implement.

While our appellate court in C. A. D. 47, *supra*, expressed its disagreement with that portion of the foregoing which held that the bale ties were not agricultural implements, it affirmed our conclusion that bale ties were not parts of agricultural implements, stating:

It clearly appears from the record that the function of a hay baler is to compress hay into the form of bales and to retain it in its compressed form until the bales have been securely tied in the manner hereinbefore set forth, and that the only function of bale ties is to hold the hay in its compressed form for storage and transportation purposes.

It is true that hay balers and bale ties are associated together in baling hay. However, each performs its separate and independent function without the loss of any of its essential characteristics, and each retains its separate identity, name, character, and use.

We are of opinion, therefore, as was the trial court, that the bale ties in question are not integral, constituent, or component parts of hay balers as claimed by counsel for appellant. * * *

Accordingly, the claim for free entry under paragraph 1604, *supra*, is denied.

With respect to the principal contention of plaintiff, to wit, that paragraph 1622, *supra*, provides for the instant merchandise, the controversy between the parties culminates, not because of a conflict in facts, but rather through contrasting views as to the proper construction and application of the provision in said paragraph for *all* binding twine.

The free-list provision for "*All* binding twine manufactured from * * * sisal grass, * * * of single ply and measuring not exceeding seven hundred and fifty feet to the pound" has appeared in substantially that form, except with respect to the number of feet to the pound, which has varied from 600 to 750 feet, since the enactment of the tariff act of August 28, 1894. Prior thereto, in the act of October 1, 1890, "all binding twine manufactured in whole or in part from * * * sisal grass * * *" was subject to a duty of seven-tenths of 1 cent per pound.

An examination into the circumstances surrounding congressional action in removing binding twine from the dutiable schedules reveals that it was the desire of the Congress to alleviate the unfortunate economic plight in which the American farmer then found himself, a condition which, in a measure, was aggravated by the protective tariff system. To permit the farmer a more profitable enjoyment of the fruits of his hard and continuing labor, the import tax upon certain articles and materials, including binding twine, was removed. See House Report No. 234 to accompany H. R. 4864, Fifty-third Congress, Second Session, December 19, 1893.

Continuously thereafter, "binding twine" has remained free of duty. Whenever, in the years intervening between 1890 and the present, the provision was the subject of congressional or Tariff Commission consideration, the phrases "binding twine" and "binder twine" appear to have been employed interchangeably, although the latter phrase predominates throughout. See House Report No. 1466, Fifty-first Congress, First Session, to accompany H. R. 9416, page 261; House Report No. 234, *supra*, pages 289, 324; Hearings before the Committee on Ways and Means, House of Representatives, Fifty-third Congress, First Session, pages 780, 806, 807; Hearings before the Committee on Ways and Means, House of Representatives, Fifty-fourth Congress, Second Session, pages 1280, 1288, 1289, 1290; Hearings before the Committee on Ways and Means, Sixtieth Congress, page 4679; Tariff Commission Surveys on the articles in paragraphs 267, 268, 269, and 270 of the Tariff Act of 1913, schedule J, pages 65, 71; Summary of Tariff Information, 1921, on the Tariff Act of 1913, pages 1252, 1253; Summary of Tariff Information, 1929, on the Tariff Act of 1922, pages 2213, 2214; Summaries of Tariff Information, 1948, Volume 10, pages 30–40.

It is fairly deducible from a review of the foregoing references that not only was the phrase "binder twine" more frequently employed, but that Congress was clearly apprised of the fact that the term in common speech for the description of twine used in harvesting operations to bind small grains into sheaves was "binder twine." Nevertheless, and with a consistency that must be deemed significant, on seven separate occasions since 1890, Congress has employed the phrase "All binding twine." The only limitations on binding twine that Congress has imposed in each instance in which binding twine has been included in the free-list provisions, are that the binding twine shall be of single ply and shall not exceed a certain maximum footage per pound.

The record in the instant case establishes that binder twine, that is, twine for use in binder machines for harvesting and wrapping small grains, has for many years been bought and sold in certain specified lengths per pound only, to wit: 500 feet per pound, 550 feet per pound, 600 feet per pound, and 650 feet per pound. These lengths, as explained by several of the witnesses in the instant case, were the most satisfactory for giving the farmer the greatest tying potential and could most satisfactorily be accommodated in the containers of the binder machines. For all that appears of record in the instant case, binder twine in lengths per pound, other than those hereinabove enumerated, has never been used. Nevertheless, Congress, in imposing limitations upon the type of merchandise it proposed could be imported free of duty, as binding twine, specified a maximum footage per pound in excess of the greatest length normally in use and im-

posed no minimum length specification. It would appear, therefore, that Congress had in mind, and intended the provision to cover, more than the article known in the trade as binder twine. Indeed, the inclusion of the word "all" in the provision would seem to preclude proof of commercial designation to limit the scope of the provision.

In the case of *Kennedy* v. *Hartranft*, 9 Fed. 18, certain cotton ties were classified by the collector under the provision of section 2504 of the Revised Statutes for all hoop iron. They were claimed to be dutiable under a provision for manufactures of iron, not specially provided for. The trial judge in his charge to the jury made the following statements:

\* \* \* the words employed in all laws are to be received in their common popular signification. Thus interpreting this act there can be no doubt as to the meaning of these terms, "all hoop iron." *It is not certainly confined to hoop iron of any particular length, but it is to be classified according to its character—whether it is hoop iron or not—irrespective of its length.*

\*          \*          \*          \*          \*          \*          \*

But, gentlemen, the act of Congress is a little broader than that. It seems clearly to contemplate something more than one kind of hoop iron. If it said hoop iron, and such was the restrictive sense, and such was satisfactorily established before you by the weight of testimony, it might possibly be proper for you to presume that Congress used the term in that restrictive sense. But "all hoop iron" would seem to exclude the inference that even one kind of iron, which is generically described as hoop iron according to the testimony of the witnesses, was not intended to be confined to it. \* \* \*

We think that the judge in that case soundly and correctly charged the jury that the inclusion of the word "all" in the paragraph before him indicated that any kind of iron which could be described as hoop iron would fall within its provisions. Similarly, in the instant case, we think that any kind of binding twine, that is, twine used in harvesting operations for binding purposes, which otherwise meets the specifications of paragraph 1622, *supra*, would be covered thereby, and that "baler twine" would fall within the definition of "binding twine."

We come, therefore, to a consideration of the meaning of the term "binding twine" as used in paragraph 1622, *supra*. It is true that in the past, "binding twine" has been held to be synonymous with "binder twine" and the two phrases therefore interchangeable. In the cases of *Independent Cordage Co., Inc.* v. *United States*, and *Vales* v. *United States*, *supra*, we held "binding twine" and "binder twine" to be synonymous and interchangeable terms which refer to the same thing. However, those cases were decided at a time when there was no merchandise other than binder twine which would fit the statutory description for binding twine, the latter of these two cases having been decided in 1942. The record in the instant case establishes that baler twine first came into extensive general use during the year 1945.

Had we at the time of our decision in the *Vales* case, *supra*, been apprised of the existence of a twine used in harvesting operations for binding purposes which would meet the specifications of paragraph 1622, *supra*, but would not be known as binder twine, we doubt that we should have so limited our holdings in those cases. This is implicit from the concurring opinion of the late Judge Tilson in the *Vales* case, *supra*, wherein he stated:

I concur in holding that the plaintiff has failed to establish a *prima facie* case, in that he has failed to show that the instant twine belongs to that class or kind of twine which, at or prior to the date of the passage of the act of 1930, was chiefly used for binding purposes. It is my view that the provision in paragraph 1622 for "All binding twine manufactured from  *  *  *  sisal grass  *  *  *  of single ply and measuring not exceeding 750 feet to the pound" covers and includes all twine manufactured from sisal grass of single ply and measuring not exceeding 750 feet to the pound which belongs to that class or kind of twine which, on or before the passage of the act of 1930, was chiefly used for binding purposes. This precludes proof of commercial designation and renders immaterial the oil content, the amount of insect repellent or insecticide contained therein, the tensile strength per pound and whether put up in balls measuring 500, 550, 600, or 650 feet to the pound or otherwise, all of which qualifications may be material factors in determining the chief use of the merchandise. In my opinion, under the provision in paragraph 1622 "All binding twine  *  *  *" which answers all the other provisions of said paragraph is dutiable thereunder whether commonly or commercially known as binding twine, provided it belongs to that kind or class of twine which, at and prior to the passage of the act of 1930, was chiefly used for binding purposes.

It must be presumed that the Congress placed all the limitations upon paragraph 1622 which it intended the paragraph to bear, and it is not the province of either the Secretary of the Treasury or this court to attempt to write into the paragraph limitations which the Congress refused to enact into the same.

Note also our statement in *Wilbur-Ellis Co.* v. *United States*, 73 Treas. Dec. 1008, T. D. 49626, wherein we considered baling wire as a binding medium.

Although all tariff data, including the 1948 Summaries of Tariff Information, use the terms "binding twine" and "binder twine" interchangeably, the argument against concluding that therefore "binding twine" means only and is restricted to "binder twine" arises from the fact that all except the last-mentioned volume were written or came into being prior to the production and widespread use of baler twine. There being no other twine falling within the tariff designation, it was most natural to assume that "binding twine" and "binder twine" were completely synonymous terms. As for the 1948 summary, it merely took cognizance of an existing administrative practice of confining the provision for "binding twine" to "binder twine" and of classifying baler twine along with other hard fiber cords and twines.

In recent authorities, not controlled by the viewpoint of classifying officers in the customs service, the tendency to group baler and binder twines together in one category is pronounced. Thus, in the 1947

Encyclopaedia Britannica, Volume 11, p. 232B, we find the following in an article on "Harvesting Machinery":

For baling hay from the windrow when the colour and moisture content are about right, use is made of the *pick-up baler* or press. This consists essentially of a pick-up device connected to and feeding a conventional baler pulled by a tractor and driven with an auxiliary engine or the power take-off of the tractor. (*See* PROCESSING MACHINERY: *Balers*) In some pick-up balers a slicing knife attached to the plunger of the baler chops the hay off after it enters the baling chamber as the plunger proceeds on its compression stroke, leaving the hay in slices rather than in folds. Where wire baling ties are used, two men who stand on boards attached to the sides of the baler are generally required to feed the wire through and tie it. On balers where twine is used, only *one* man is needed as the tying is wholly automatic. This twine on some machines is about three times the size of *ordinary binder twine*. In another type the pick-up carries the hay to a series of belts which roll it into a cylindrically shaped bale, much as rolling up a rug, and a special needle ties the bale with ordinary binder twine by wrapping it spirally around for a few turns. [Last italics ours.]

In the volume entitled "Long Vegetable Fibers" written in 1947 by Ludwig Weindling, a consulting engineer and expert in the cordage field, the following statement appears:

The three main classes of cordage are binder twine, wrapping twine, and rope. BINDER-TWINE PRODUCTS.—Almost half the total cordage made of hard fiber consists of binding twine. Binder twine is used to tie into bundles the sheaves of small grains such as wheat, oats, barley, rice, etc., cut by grain-harvesting machines. In the same general category must be placed the new hay-baler twine, which is used for bundling hay cut and baled by machine.

Webster's New International Dictionary of the English Language, 2d Edition, 1948, defines "binding twine" as "Binder twine" and "binder twine" as:

A coarse slack-twisted twine or thin rope used in binding, esp. in tying grain after cutting.

It is to be noted that binder twine is therein described as used in the operation of tying grain after cutting but not exclusively restricted to such use. Furthermore, the same dictionary defines "twine binder" as:

*Agric. Mach.* **a** The binding mechanism of a binder. **b** A binder using twine to bind the grain or fodder into bundles.

The definition of "fodder" contained in the same volume is:

That which is fed out to domestic animals; esp., coarse food for cattle, horses, and sheep, as hay, vegetables, corn fodder, etc.

It is thus evident that the dictionary does not limit the definition of binding twine to twine used solely for binding small grains. The definition is flexible enough to include any twine used in harvesting operations for binding purposes. This court finds no reason why it should exclude baler twine, since it is a twine used in harvesting operations for binding purposes.

It would seem that an anomaly would result from any holding that twine which meets the specifications set forth in paragraph 1622, *supra*, and is used in harvesting operations for the binding of small grains, is free of duty, whereas twine, which likewise meets the specifications of the provision but is used in harvesting operations for the binding of hay, is not free of duty. Statutory constructions which result in anomalies are to be avoided if the language of the legislature so permits. *United States* v. *Lehman Co., Inc.*, 22 C. C. P. A. (Customs) 106, T. D. 47081; *Elmer T. Middleton* v. *United States*, 28 C. C. P. A. (Customs) 214, C. A. D. 148. We are of opinion that the language of paragraph 1622, *supra*, is sufficiently broad to enable us to avoid an inconsistent ruling and to hold that all twine falling within the limitations of the paragraph, chiefly used in harvesting operations for binding purposes, is "binding twine."

We held in both the *Independent Cordage* and *Vales* cases, *supra*, that the provision of paragraph 1622, *supra*, for "binding twine" was an *eo nomine* designation by use and that twine to be entitled to classification thereunder must be shown to have been chiefly used for binding purposes in harvesting operations at or prior to the passage of the Tariff Act of 1930. This principle would apply to all kinds and classes of twine which were known to commerce at and prior to June 17, 1930.

Where, however, an article of merchandise subject to classification under a use provision comes into existence after the passage of the tariff legislation under construction, and is not of the class or kind of merchandise chiefly used for the specified purpose as of that date, all that is necessary to show is chief use of the class in the manner prescribed by the statute at or about the time of importation. *United States* v. *Paul G. Downing et al.*, 16 Ct. Cust. Appls. 556, T. D. 43294; *W. J. Green* v. *United States*, 8 Cust. Ct. 173, C. D. 599. And proof of chief use of the particular importation is neither significant nor material. *United States* v. *Spreckels Creameries, Inc.*, 17 C. C. P. A. (Customs) 400, T. D. 43835; *Brown & Co.* v. *United States*, 7 Ct. Cust. Appls. 309, T. D. 36871.

On the issue of chief use at the time of importation, the record in the instant case, sufficiently establishes *prima facie* that the merchandise in question was of a class or kind of twine which, at the time of importation, was chiefly used in harvesting operations for binding purposes. In this connection, the witness Fitzmaurice, the manufacturer of the imported merchandise, testified that he personally designed the twine to meet the specifications of the automatic hay-baler machine; that the imported merchandise was baler twine; that he saw baler twine manufactured by him, similar to but not from the instant importation, used in an automatic hay-baling machine on one occasion in the San Joaquin valley in California. He stated further that the imported baler twine was similar in material,

texture, and composition to "Guardsman" baler twine which he also manufactured.

The witness Odell testified that his company sold "Guardsman" baler twine, the name "Guardsman" being a registered trade name for several of his company's products, that he personally sold such merchandise in 11 states in the Pacific area; that he saw it being used about a dozen times a year, since 1947, in automatic hay-baling machines for the baling of hay and *that he never saw it used in any other way.*

The witness Barr, a research and agricultural engineer at Louisiana State University, testified that plaintiff's illustrative exhibit 1, which had been established to be a sample of the imported merchandise, was a type of twine that is used in a pick-up baler and that it was baler twine.

The witness James, general manager of Brantford Cordage Co., Ltd., of Canada, who had been with that concern for approximately 20 years, was fully familiar with all of the operations of his concern, had made a study of the manufacture of harvesting twines and all their uses, and had seen automatic hay-baling machines operated on numerous occasions in the United States, specifically in the states of New York, Illinois, Indiana, Missouri, Iowa, and Minnesota, stated that plaintiff's illustrative exhibit 1 was baler twine normally used in the automatic pick-up balers produced by the International Harvester Co. and New Holland Machine Co.

Plaintiff's witness Stenson testified that illustrative exhibit 1 was baler twine; that he had seen baler twine used in an automatic baler which picks up and bales hay; and that the function of the twine is to bind the bales.

Defendant's witness Russell, vice president in charge of sales of the Columbian Rope Co. of Auburn, N. Y., a concern which manufactures twines of all kinds, including baler and binder twines, testified that baler twine is used to hold together a heavy bale of compressed hay.

The witness Painter, employed by the Plymouth Cordage Co., which also manufactures ropes and twines, including binder twine and baler twine, testified that the baler machine employs baler twine and that plaintiff's illustrative exhibit 1 was the same type of baler twine with which he was familiar but that the balls of baler twine which his company manufactures are of different size.

Defendant's witness Ferguson, a practical farmer, testified that in baling hay, he employs the International Harvester machine and that in that machine he uses baler twine.

It is significant that no witness testified to or even suggested any other use of baler twine than in an automatic pick-up hay-baler machine. Nor did any of defendant's witnesses intimate at any time that plaintiff's illustrative exhibit 1 was not baler twine, or

merchandise of the class or kind chiefly used at the time of importation in an automatic hay-baling machine.

Moreover, counsel for the respective parties, speaking through a representative of counsel for the defendant, entered into the following stipulation:

* * * Without the defendant conceding that the merchandise at bar was used in automatic or pick-up baling machines for the baling of hay and without conceding that there is a class of twine that was chiefly used in automatic or pick-up baling machines for the baling of hay, it is agreed that at the time of the importation herein, baler twine was chiefly used in automatic or pick-up baling machines for the baling of hay.

That automatic or pick-up baling machines have been in use in the United States since 1936, and were not used prior to that time.

That for many years prior to 1930 and ever since then, binders were operated in the United States with the use of twine other than and different from the twine used since 1936 with automatic or pick-up baling machines and that baler twine used with such automatic or pick-up baling machines is not used and cannot be practically or commercially used with binders.

We note a certain inconsistency between the statement "without conceding that there is a class of twine that was chiefly used in automatic or pick-up baling machines for the baling of hay," and the concession that "it is agreed that at the time of the importation herein, baler twine was chiefly used in automatic or pick-up baling machines for the baling of hay." If, and we must accept the stipulation as a proven fact, baler twine was, at the time of importation, chiefly used in the baling of hay, *ipso facto* there is a class of twine, to wit, "baler twine" which at the time of importation was chiefly used in an automatic or pick-up baling machine.

In the case of *United States* v. *F. W. Woolworth Co.*, 23 C. C. P. A. (Customs) 98, T. D. 47765, our appellate court stated:

We are not unmindful of the rule that in order to establish "chief use" the evidence of use must relate to the United States generally, and not to a limited portion thereof. It may be proper to observe, however, that the question of whether "chief use" has been properly established depends upon the issues and the evidence in each case.

We think it is a proper deduction from the evidence, and from the character of Exhibits 1, 2, and 3, that the involved articles would be used in substantially the same manner, and by substantially the same class of people, in one section of the country as in another, and that evidence establishing their chief use in a large area of the country is sufficient under the rule.

In the light of the evidence which we have here detailed, and under the authority of the *F. W. Woolworth Co.* case, *supra*, we think that it has been sufficiently affirmatively shown that the merchandise with which we are here concerned is baler twine and that merchandise of the same class or kind was, at or about the time of importation, chiefly used in automatic hay-baling machines for the purpose of binding up bales of hay.

The testimony as to chief use was, of course, confined to the period of time since 1945 when the automatic hay-baling machines first came into general use and extended to and covered the period of time immediately before and after the importation involved in this case. In view of our conclusion that the provision of paragraph 1622, *supra*, includes all twine made of the fibers therein described, of single ply, and not exceeding 750 feet to the pound, which is chiefly used in harvesting operations for binding purposes, and in view of the fact that plaintiff has established that twine of the class or kind to which the instant merchandise belongs was, at or about the time of importation, chiefly used in harvesting operations for the binding of hay into bales, we now hold that the protest claim for classification of the imported merchandise under paragraph 1622, *supra*, should be sustained.

Judgment will be entered accordingly.

### CONCURRING OPINION

FORD, Judge: I concur in the conclusion reached by my associates solely by reason of the stipulation entered into by counsel for the respective parties that "* * * at the time of the importation herein, baler twine was chiefly used in automatic or pick-up baling machines for the baling of hay," it having been established previously that the involved merchandise belonged to that class or kind of twine known as baler twine.