(C. D. 223)

INDEPENDENT CORDAGE CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 10, 1939)

*Strauss & Hedges* (*Eugene F. Blauvelt* and *Howard C. Carter* of counsel) for the plaintiff.

*Webster J. Oliver,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney), for the defendant.

*William Whynman* filed a brief as *amicus curiae.*

Before TILSON, KINCHELOE, and DALLINGER, Judges.

KINCHELOE, Judge: The merchandise here in issue consists of 300 bales of single ply sisal twine imported in balls weighing 5 pounds, packed 10 balls to the bale, and measuring not exceeding 750 feet to the pound. It was classified and assessed for duty by the collector at the rate of 40 per centum ad valorem under paragraph 1005 (b) of the Tariff Act of 1930, which so far as pertinent, reads as follows:

PAR. 1005 (b). Cords and twines * * * tarred or untarred, single or plied, wholly or in chief value of * * * sisal * * * or other hard fiber, 40 per centum ad valorem.

While the original protest filed by plaintiff herein sufficiently claims the merchandise in question to be free of duty as sisal binding twine, plaintiff has nevertheless amended the protest at the trial so as to claim more specifically that "the merchandise is free of duty under paragraph 1622, Tariff Act 1930," which so far as relevant, reads as follows:

PAR. 1622. All binding twine manufactured from * * * sisal grass * * * of single ply and measuring not exceeding 750 feet to the pound.

The 300 bales of twine in controversy were part of a shipment of 400 bales, 100 bales of which were passed free of duty as sisal binding twine under said paragraph 1622. The appraiser's report with reference thereto, admitted in evidence herein by consent and marked Exhibit 1, reads:

The merchandise in question consists of sisal twine of single ply and measuring not exceeding 750 feet to the pound. T. D. referred to in the protest recognizes

binder twine having 2.15% of oil as binder twine. The question of no oil whatever in so-called binder twine has never been passed on by the Courts. The shipment in question, consisting of 400 bales of so-called binder twine had 10% submitted to analysis as to its oil content. The importer agreed to stand by this analysis. As a matter of fact, 4 bales were ordered to Public Stores and subsequently 40 more bales came in, making a total of 44 bales examined, 15 of these having an oil content of less than 2.15%—the balance having more—never exceeding an oil content of 3%. It was returned for duty at 40% under par. 1005 (b), act of 1930.

From the above it would appear that the sisal twine assessed for duty under said paragraph 1005 (b) apparently had an oil content of 3 per centum and less. It is the contention of the Government, however, that in order for twine to come within the purview of said paragraph 1622 it must fulfill the commercial meaning of binding twine, and must contain not less than 10 percent of oil, etc., in addition to being composed of hard fiber, of single ply, and measuring not exceeding 750 feet to the pound.

No sample of the involved merchandise is in evidence. The Government officials apparently failed to retain one, and plaintiff was unable to produce any for the reason that all of the importation had been sold.

The testimony on both sides is in entire agreement that the tariff term "binding twine" and the term "binder twine" are synonymous and interchangeable terms, and have reference to one and the same thing.

The definition of "binding twine" is given in Webster's New International Dictionary, 1933 edition, on page 224, as follows:

Binding twine. A coarse slack-twisted twine or thin rope used in harvesting machines to bind the grain after cutting.

From this it is quite obvious that the tariff provision for "binding twine" is an *eo nomine* designation by use, just as was held by the appellate court with regard to the provision for "Standard newsprint paper" in paragraph 1772 of the Act of 1930. *United States* v. *Tower & Sons*, 26 C. C. P. A. 1, T. D. 49534. In that case it was held further by the court that in determining the meaning of an *eo nomine* use designation it must be determined by the proven chief use of the merchandise in this country at or immediately prior to the passage of the tariff act.

On the issue herein three witnesses testified on behalf of plaintiff. The first, Mr. Kelmenson, treasurer of the Independent Cordage Co., the importer of the merchandise in question, stated that his company imports and distributes twines and cordage, including binding twine; that his understanding of binding twine is twine that runs between 500 and 750 feet to the pound, put up in either 5-pound or 8-pound balls; and that he never put any twine through an oil test to determine whether or not it was binder twine. He further testified that

200 bales of the shipment in question were sold to D. & L. Ward Co., of Philadelphia, as binder twine, and he put in evidence as Collective Exhibit 2 copies of two invoices of his company showing that the merchandise had been so invoiced.

Plaintiff's second witness was Mr. Bancroft, manager and buyer of the twine department of D. & L. Ward Co., of Philadelphia. He remembered the shipment of 200 bales of twine received from the importing company, and stated that it was binding twine; that it was sold by them to hardware stores, grain people, and fertilizer people in the rural districts for sale to the farmers (R. 33); that while he had many years' experience in buying and selling binder twine he never bought and sold it upon the basis of any oil content. The witness could not, however, tell what the ultimate purchasers of the merchandise in question actually used the twine for, or to what extent, if any, it was used on harvesting machines for binding grain. On cross-examination he stated that he had sold wrapping twine similar to binder twine; that one-ply wrapping twine might be the same as binder twine, but that he could tell the difference, however, by looking at it, and that "ordinarily when you touch binder twine it has a certain amount of oil in it." (R. 42.)

The third witness for plaintiff, Mr. Mintzer, stated he was a salesman of binder twine since 1921, and that he also sold the general line of twines and cordage; that quite often he followed the use of the binder twine into the hands of the ultimate consumers, and that it is used on a machine called a binder, which cuts, picks up, and binds the grain on the field (R. 47). On cross-examination he was not sure that he saw the twine here in controversy, and stated that his testimony as to the use of twine in a binder machine did not refer to the merchandise in question, but to binder twine in general. The witness defined binder twine as being of single yarn running from 500 to 750 feet to the pound; that it should have a breaking strength of from 85 to 100 pounds; that it should be fairly even and uniform, and put up in 5 or 8-pound balls, and packed in bales of 50 pounds. He further stated he was not certain whether that is true of wrapping twine, and that he is not familiar enough with wrapping twine to answer that; that in his opinion the use to which binder twine is put has nothing to do with its being binder twine.

The Government, on its part, produced four witnesses, representing manufacturers and sellers of twines and cordage, including binding twine, in the United States, for the purpose of proving commercial designation or understanding of the term "binding twine," different from the common meaning thereof as hereinbefore quoted. Briefly summarized, their testimony is to the effect that the term "binding twine" or "binder twine" in the trade of the United States on or before the date of the Tariff Act of 1930, had reference to a single ply yarn of

hard fiber for use in self-tying grain binders, made exclusively in four yardages of 500, 550, 600, and 650 feet to the pound, containing an oil content of 10 to 15 per centum, and an insecticide to prevent injury or destruction of the twine by grasshoppers and crickets, put up in either 5-pound or 8-pound balls, and packed in about 50-pound bales. Also that such commercial understanding was definite, uniform, and general throughout the United States at the time of the passage of the tariff act.

At the trial counsel for the plaintiff made objections to all questions on the part of Government counsel tending to prove a commercial meaning of the term "binding twine" or "binder twine" different from the common meaning, on the ground that it is not susceptible of commercial designation, and also on the ground of being immaterial and irrelevant in view of the language of the statute itself, reading "all binding twine," etc., which he claimed would include binding twine either commonly or commercially so known, so long as the twine otherwise came within the specifications of said paragraph 1622.

This court, while expressing its doubt as to the competency of any such commercial testimony, let the Government witnesses testify, and invited counsel on both sides to cover the point in their briefs. At the conclusion of the testimony of each of the Government's witnesses counsel for the plaintiff moved to exclude same on the grounds already stated, which motions were taken under advisement by this court.

Plaintiff claims in its brief that the appraiser's report clearly discloses that the classification of the merchandise under said paragraph 1005 (b), as sisal twine, was based solely on the fact that it did not contain an oil content of more than 3 per centum, and that as the merchandise otherwise meets all the specifications of binding twine as set forth in said paragraph 1622, it should be entitled to free entry as such under the decision of this court in *Geo. Wm. Rueff, Inc.*, v. *United States*, T. D. 47033. We do not, however, think such conclusion is warranted by the record or by said cited case. In the first place, the appraiser, of course, is not the classifying officer, and, in the second place, the facts as to the chief use of the merchandise are not the same herein.

In the *Rueff* case the classification of the merchandise as binding twine was denied by the collector solely for the reason that it did not contain as much as 8 per centum of oil, as required by Treasury regulation, T. D. 45026. It was shown, however, therein that the sisal twine not only met all the specifications of paragraph 1622 for binding twine, but was "used exclusively in agriculture on farms and in harvesting machinery to bind up sheaves of grain." Furthermore, no attempt was made by the Government to show commercial designation of the term "binding twine" different from the common under-

standing thereof. On that record this court held said regulation of the Treasury Department to be invalid and void as an abridgment of the law.

In the present instance there is no testimony as to what the particular importation of twine was used for, much less that this kind or class of twine was chiefly used on binder or harvesting machines for binding grain. If "binding twine" or "binder twine" is to be regarded as an *eo nomine* designation by use, as above indicated by us, chief use of the merchandise on harvesting machines for binding grain is undoubtedly of paramount importance to establish its character as binding twine, apart from the other specifications called for by said paragraph 1622. This was also indicated by us in the later case of *Geo. Wm. Rueff, Inc.* v. *United States*, T. D. 49151, decided September 1, 1937, raising the question as to the validity of the regulation of the Secretary of the Treasury (T. D. 40805) requiring that binding twine "must contain approximately not less than 500 feet to the pound." This court held this regulation also invalid for the same reason as that given in the first *Rueff* case, *supra*, and, in sustaining plaintiff's claim for free entry of the merchandise as sisal binding twine, did so on the showing that the twine therein was of the kind or class wholly or chiefly used on harvesting machines for the binding of grains, as will be seen by the following language of the court:

The testimony taken as a whole shows that the imported merchandise is of the character or kind wholly or chiefly used on harvesting machines for the binding of grains such as wheat, corn, rice, etc., and that it is so used whether it measures 750, 500, 475, or less feet to the pound. The testimony further shows that the merchandise meets all the statutory requirements for classification as binding twine (which is shown to be synonymous with binder twine) as laid down in said paragraph 1622 of said act of 1930, in that it is manufactured from sisal grass, is of single ply, and measures not exceeding 750 feet to the pound.

The failure of proof on the question of chief use of the kind or class of sisal twine in the present instance is necessarily fatal to plaintiffs' claim, especially as its own witness Bancroft testified on cross-examination that his definition of binding twine would be a good definition of one-ply wrapping twine, and who also, when asked what physical aspects wrapping twine had that binder twine did not have, answered that "ordinarily when you touch binder twine, it has a certain amount of oil in it."

That all binder or binding twine contains some oil seems to be borne out by this record as well as that in the *Rueff* case, *supra* (T. D. 47033). Just how much oil is necessary or advisable in binding twine is not here shown, nor is it shown in fact why any is really necessary. It might be pertinent right here to state, however, that if twine were shown to be chiefly used on harvesting machines for the binding of grain, it would seem that the only natural and logical inference to be drawn

therefrom would be that the amount of oil therein necessarily is sufficient to serve such purpose.

However, as the protest herein must be, and hereby is, overruled for failure of proof on the question of chief use, we find it unnecessary to pass on the question whether the term "binding twine" within the specifications of said paragraph 1622, is susceptible of proof of commercial designation different from the common meaning thereof, and, if so, whether such commercial meaning has been established by the defendant, or whether the language "all binding twine" in said paragraph 1622 is to be interpreted as covering all twine either commonly or commercially so known.

The testimony of defendant's witnesses in the present instance is therefore really not a material factor in the determination of *this* case. Under the circumstances, however, we shall let it stand, and overrule the motion of counsel for the plaintiff in each instance to exclude it from evidence, with an exception to counsel for plaintiff to such ruling. Judgment will be rendered accordingly.