(C.D. 2331)

BOB STONE CORDAGE COMPANY ET AL. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 12, 1962)

*James J. Morrison* (*Albert V. Hass* and *Lic. Jorge Lopez Munoz* of counsel) for the plaintiffs.

*William H. Orrick, Jr.*, Assistant Attorney General (*Richard H. Welsh*, trial attorney), for the defendant.

*William Whynman* as *amicus curiae*.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: In the cases listed in the schedule of protests, attached to this decision and made a part hereof, which have been consolidated for purposes of trial, plaintiffs contest the assessment of duty at the rate of 15 per centum ad valorem on certain imported twine, composed of Mexican sisal. The assessment was made by the collector of customs at the port of entry, by virtue of the provisions of paragraph 1005(b) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, for—

Cords and twines (whether or not composed of three or more strands, each strand composed of two or more yarns), tarred or untarred, single or plied, wholly or in chief value of manila (abaca), sisal, henequen, or other hard fiber.

It is claimed in the protests that said twine is entitled to free entry within the provisions of paragraph 1622 of said act, as amended, for—

All binding twine, and twine chiefly used for baling hay, straw, and other fodder and bedding materials, manufactured from New Zealand hemp, henequen, manila, istle or Tampico fiber, sisal grass, or sunn, or a mixture of any two or more of them, of single ply and measuring not exceeding seven hundred and fifty feet to the pound.[1]

The merchandise in issue was invoiced as binder twine. According to the chemist's reports, which have been received in evidence, it

---

[1] The amendment, effective October 25, 1951, inserted the phrase "and twine chiefly used for baling hay, straw, and other fodder, and bedding materials."

consists of a single-ply twine (Agave fiber) having the following specifications:

| Protest | Entry | Brand | No. of feet per pound | Percentage of oil, by weight | Weight of ball |
|---------|-------|-------|-----------------------|------------------------------|----------------|
| 260654–K | 0248 | Ozark | 453 | 12.6 | 8 lbs. 3.5 ozs. |
| | 01963 | Champion | 473 | 10.2 | 8 lbs. 0.2 ozs. |
| 58/21043 | 5137 | Blue Bow | 457 | 11.8 | 7 lbs. 11.5 ozs. |
| | 460 | A.C. | 387 | 11.4 | 8 lbs. 3.0 ozs. |
| 307886–K | 06828 | Hy Glo | [2] 352 | over 8% | 8 lbs. 4¼ ozs. |
| 59/22486 | 09804 | AC | 469 | over 8 | 7 lbs. 7.8 ozs. |

The consumption entries and the collector's answers to the protests have also been admitted into evidence without objection. As to the latter documents, however, it appears that they were filed more than 90 days after receipt of the protests to which they were addressed, except in the instance of protest 260654–K, and, hence, under settled law, are untimely and may not properly be considered as evidence. *United States* v. *California Milk Producers Association et al.*, 35 C.C.P.A. (Customs) 126, C.A.D. 382; *Oakland Food Products Co. et al.* v. *United States*, 32 C.C.P.A. (Customs) 28, C.A.D. 281. Whether or not the Government, by not objecting to the admission of said answers, in effect, has conceded the facts therein contained relating to the classification of the instant merchandise, need not here be determined, since the issue raised by plaintiffs in connection therewith is posed by the timely answer in protest 260654–K. There, the merchandise is described by the collector as "Binder Twine," classified under "Par. 1005(b), TA 1930" and assessed with duty at the rate of "15%." It further states as the basis of affirmation, "Appraiser's advisory classification."

At the outset, it must be remarked that counsel for plaintiffs relies heavily upon the collector's description of the merchandise as "Binder Twine" in support of an argument to the effect that such description constituted a classification of the merchandise in issue, and that, therefore, the collector was not authorized to liquidate the entries as dutiable under paragraph 1005(b), as modified.

The collector's function, as defined by section 505 of the Tariff Act of 1930, is to "ascertain, fix, and liquidate the rate and amount of duties to be paid on such [entered] merchandise as provided by law * * *." Under section 514 of said act, protest lies against his decision "including the legality of all orders and findings entering into the same, as to the rate and amount of duties chargeable." Basically, therefore, it is the assessment of duties, not the classification *per se*, which is the protestable act. The classification may be attacked as a finding entering into the decision as to the rate and amount of duties, but it is clearly

[2] Average of 3 determinations.

subordinate to, and becomes merged in, the liquidation, which is the final computation of the amount of duties determined to be due the United States. *United States* v. *B. Holman, Inc.*, 29 C.C.P.A. (Customs) 3, C.A.D. 164.

In any event, there is no tariff provision for "binder twine," and the assessment of duty at the rate of 15 per centum ad valorem constitutes a determination that the twine, albeit described as binder twine, is not the "binding twine" provided for in paragraph 1622, but is, in fact, the single-ply twine described in said paragraph 1005(b), as modified. The argument on this phase of the case is, therefore, deemed untenable.

It appears from the official papers and the evidence given by the appraiser of merchandise at the port of New Orleans, La., that the merchandise in issue was advisorily classified as other than binding twine because it did not meet the "specifications recognized in the trade as binder twine." "It is what we call underweight footage; it was irregularly woven or wound and according to our information, as gathered from the trade, it would not be good delivery as binder twine."

In the case of *United States* v. *Geo. Wm. Rueff, Inc.*, 41 C.C.P.A. (Customs) 95, C.A.D. 535, it was held that the new language added to paragraph 1622 by the 1951 amendment did not enlarge the scope of the provision, but served merely to clarify the wording originally appearing in the act. It was further held that the phrase "All binding twine" embraced any twine meeting the specifications of paragraph 1622 and not exceeding the maximum length therein prescribed, chiefly used in agricultural pursuits, either for the tying or binding of small grains, or for tying and binding purposes in harvesting operations.

The merchandise involved in the *Rueff* case was a single-ply sisal twine, running 200 feet to the pound, with an average tensile strength of 240 pounds, containing 12 to 15 per centum of oil by weight, and treated with insect and rodent repellents. It was shown that twine of that character was designed to meet the requirements of automatic hay balers; that it was generally known as baler twine and chiefly used in automatic or pickup baling machines for the baling of hay.

It was also established that a commodity known as binder twine was ordinarily used in binder machines for wrapping or tying sheaves of small grain; and, to some extent, in a machine manufactured by the Allis-Chalmers Co., which produced a carpet-like bale of hay. Such twine was described as usually 500, 550, 600, or 650 feet to the pound, having an average tensile strength of 85–90 pounds, and containing not less than 10 per centum of oil.

It was the contention of the Government and of *amicus curiae* in the *Rueff* case that binder twine and binding twine were synonymous terms and that since the record established that baler twine was not

binder twine, it could not be embraced by the provision for "All binding twine." One of the supporting factors in that contention was the disparity in length per pound between binder twine and baler twine.

In sustaining the importer's claim that baler twine was binding twine within the contemplation of paragraph 1622, the court quoted with approval the following excerpt from this court's opinion (28 Cust. Ct. 84, C.D. 1392) as follows:

It is fairly deducible from a review of the foregoing references that not only was the phrase "binder twine" more frequently employed, but that Congress was clearly apprised of the fact that the term in common speech for the description of twine used in harvesting operations to bind small grains into sheaves was "binder twine." Nevertheless, and with a consistency that must be deemed significant, on seven separate occasions since 1890, Congress has employed the phrase "All binding twine." The only limitations on binding twine that Congress has imposed in each instance in which binding twine has been included in the free-list provisions, are that the binding twine shall be of single ply and shall not exceed a certain maximum footage per pound.

The record in the instant case establishes that binder twine, that is, twine for use in binder machines for harvesting and wrapping small grains, has for many years been bought and sold in certain specified lengths per pound only, to wit: 500 feet per pound, 550 feet per pound, 600 feet per pound, and 650 feet per pound. These lengths, as explained by several of the witnesses in the instant case, were the most satisfactory for giving the farmer the greatest tying potential and could most satisfactorily be accommodated in the containers of the binder machines. For all that appears of record in the instant case, binder twine in lengths per pound, other than those hereinabove enumerated, has never been used. Nevertheless, Congress in imposing limitations upon the type of merchandise it proposed could be imported free of duty as binding twine, specified a maximum footage per pound in excess of the greatest length normally in use and imposed no minimum length specification. *It would appear, therefore, that Congress had in mind, and intended the provision to cover, more than the article known in the trade as binder twine. Indeed, the inclusion of the word "all" in the provision would seem to preclude proof of commercial designation to limit the scope of the provision.* [Italics supplied by the Court of Customs and Patent Appeals.]

The appellate court then went on to say:

Coming then to an interpretation of the term "binding twine," as used in paragraph 1622, there is no doubt in our minds as to the validity of the Government's contention that the term has been used synonymously and interchangeably with the term "binder twine" in judicial decisions as well as in Congressional proceedings. However, it does not necessarily follow that such use of the terms precludes admission of the involved twine into the provisions of paragraph 1622. The definitions cited by the trial court show that the term "binding twine" is not limited solely and exclusively to the tying or binding of small grains, but are flexible enough to include twine of the instant type in harvesting operations for tying or binding purposes.

While there are, as pointed out above, some differences in the physical composition of the two twines, at the same time they also possess many similar physical characteristics as well as in the common use to which they are put,

Both are used in what are clearly agricultural pursuits, viz, in the binding of small grains and in the baling of hay. See *Wilber-Ellis Co.* v. *United States*, 26 C.C.P.A. (Customs) 403, 407, C.A.D. 47.

While it is true the involved twine was not in existence when the Tariff Act of 1930 was enacted, it is axiomatic that Congress legislates for the future as well as for the present, and we must assume that Congress, in writing the instant paragraph, imposed therein all of the limitations which it intended that class and kind of merchandise to bear. Clearly, it was not necessary for Congress to employ the word "all" unless it intended that word to encompass *all* of the twine which met the specific requirements thereof. We are in agreement with the trial court that the involved twine meets those limitations and that paragraph 1622 should control. [Italics quoted.]

We have discussed the *Rueff* case at some length here, for the reason that it is our view that its principles are of controlling significance in any determination of whether a single-ply twine, composed of one of the fibers specified in paragraph 1622 and measuring not exceeding seven hundred and fifty feet to the pound, falls within the provisions for all binding twine or twine chiefly used for the bailing of hay. Clearly, it is not the name under which the twine is distributed, nor the number of feet to the pound it measures, if not exceeding the statutory maximum, which is determinative. The only criterion which permits the application of the binding twine provision is the use to which the merchandise is devoted. If it is of a class or kind of twine which is chiefly used in agricultural pursuits for binding purposes, and otherwise fits the description of paragraph 1622, it is binding twine, entitled to free entry.

Before determining whether the evidence in the instant case shows that the subject twine is chiefly used in agricultural pursuits for binding purposes, certain general principles pertaining to the subject of use merit consideration. It is well settled that when the classification of imported merchandise is governed by the use to which it is applied, the controlling issue is chief use. *United States* v. *The Baltimore & Ohio R.R. Co.*, 47 C.C.P.A. (Customs) 1, C.A.D. 719. Chief use is a fact which must be established with respect to the class of merchandise to which the importation belongs and, hence, the actual use of the particular importation, though relevant, is not material. *United States* v. *C. J. Tower & Sons*, 26 C.C.P.A. (Customs) 1, T.D. 49534. Chief use depends upon the way in which the major portion of the given class of articles is utilized, throughout the United States generally, unless it be shown that the merchandise is distributed and used in a more limited area. *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, T.D. 42240; *United States* v. *S. S. Perry*, 25 C.C.P.A. (Customs) 282, T.D. 49395; *L. Tobert Co., Inc., et al.* v. *United States*, 41 C.C.P.A. (Customs) 161, C.A.D. 544. And neither a fugitive use, nor a susceptibility for use, possesses any probative value, *United States* v. *The Baltimore & Ohio R. R. Co., supra.*

It remains to be seen whether the record in the instant case establishes chief use within these well-settled principles. It is a lengthy record, consisting of the testimony of seven witnesses, and 30 exhibits, in addition to the official papers, all of which was introduced in behalf of plaintiffs.

A substantial portion of the testimony relates to the way in which Mexican sisal is processed into baler and binder twine in Mexican cordage mills, and some of the principal reasons why variations in length per pound may, and often do, occur. Generally speaking, after the fibers are brought into the plant, they are fed into a series of machines which comb and spin them into twine, which, in turn, is wound into balls. In the first combing process, the fibers are treated with oil and insecticides and are drawn out into so-called slivers. Thereafter, the slivers are further attenuated in drawing machines, before they are twisted or spun into twine. Whenever the ends of the slivers are joined, or pieces fall from them, they are spliced, causing a thickening, which is reflected in the finished twine, producing the variation in the number of feet per pound. Since the machines are automated for conformity in weight, variations in footage are not readily controllable.

Plaintiffs' witness Castro, cordage technician for Cordeleria de San Juan, S.A., Merida, Yucatan, Mexico, the company which manufactured part of the twine involved in this case, defined binder twine as a single-ply twine, composed of Mexican sisal, treated with an oil emulsion containing insecticides and rodent repellents, having a breaking strength of between 50 and 80 pounds, running approximately 550 feet to the pound, and packaged in either six 8-pound balls or ten 5-pound balls to the bale. He described baler twine as similarly produced, but thicker, running approximately 220 feet to the pound.

This witness stated that the twine in issue was a part shipment of an order of 200 bales of binder twine and 1,800 bales of baler twine.

No samples of the present shipments are in evidence, since apparently all of the merchandise was distributed after importation. However, plaintiffs have introduced as illustrative exhibits 2 and 3, respectively, a ball of binder twine, approximately 500 feet to the pound, and a ball of baler twine, approximately 220 feet to the pound, which this witness characterized as similar to the products shipped by his firm, except with respect to color.

Thomas Mansfield, presently a farmer, testified for plaintiffs that, for a period of approximately 25 years prior to 1955, he was in the farm-equipment business, selling and servicing twine products and hardware, through portions of the States of Nebraska, Oklahoma, Kansas, Arkansas, Missouri, and Iowa. As a consequence, he was familiar with automatic machines for baling hay, and for binding

grains. He described plaintiffs' illustrative exhibit 2 as binder twine which—

Up until the introduction of the Roto baler, this twine here was commonly referred to as binder twine and the usage of it in our area now would be approximately 95% for baling purposes and about 5% for the old type grain binder, which is not very much in use any more.

The Roto baler to which he referred, and the only one he knew of in operation in the United States, was that produced by the Allis-Chalmers Manufacturing Co. This machine turns out a round bale which is left lying in the field for cattle feed. It uses a binder twine, similar to plaintiffs' illustrative exhibit 2, which it wraps around the bale of hay. By contrast, baler twine, as typified by plaintiffs' illustrative exhibit 3, is used in automatic hay-baling machines, which produce square bales.

This witness was the sole distributor of Ozark brand binder twine, which he purchased from plaintiff Bob Stone Cordage Company and sold in 1955 and 1956. In the areas in which he sold it, about 95 per centum of it was used in Roto balers, "because there isn't, according to machine estimates, over two binders per county in that area." He stated that he had never had any complaints about the Ozark brand binder twine which he sold.

The following pertinent testimony was given by the witness in answer to questions posed by the court:

JUDGE LAWRENCE: I understood you to testify that merchandise like Exhibit 2 is commonly used in your experience for binding purposes as a binder twine.

THE WITNESS: Exhibit 2, you mean? In our area it is commonly used, as we refer to it, as a baling twine.

   *       *       *       *       *       *       *

JUDGE LAWRENCE: Would it make any difference, in your opinion, about the use of merchandise like Exhibit 2, regardless of its length per pound?

THE WITNESS: This Exhibit 2? It wouldn't be a question to the purchaser about the footage per pound. The main object is the tensile strength. He doesn't like either type of twine breaking on him because that is when he gets into trouble.

   *       *       *       *       *       *       *

JUDGE LAWRENCE: Now, if Exhibit 2 appeared to be or was established to be 350 feet per pound, would that change your opinion in any way?

THE WITNESS: Oh, yes, it would to some extent. If I noticed in the process of baling that I wasn't getting the number of bales out of a ball or a bale of twine, then it would become evident to me that the twine was a little heavier a grade because, assuming I know the weight to be there, it just wouldn't bale as much hay per bale.

JUDGE LAWRENCE: Would it follow your statement that it could not be economical to use twine if it be over 352 feet to the pound?

THE WITNESS: Well, sir, I would say if it all averaged 350 feet per pound, then the manufacturer would have to correct it because he advertises it. All

I ever saw it advertised, it averaged 500 feet per pound, and I believe averaged 90-pound tensile strength.

JUDGE LAWRENCE: Well, if in fact Exhibit 2 averaged 352 feet to the pound, would you still say it was commonly usable as a baling twine?

THE WITNESS: Oh, yes, you can adjust your machine and the farmer does look at the economics on anything he does now. I suppose he would adjust his machine where he wouldn't take as many wraps around the bale if he was using a stronger twine, because that did happen to us once. You can circle that bale as many times as you want to, according to the adjustment of the machine, and sometimes I do myself if I know I am not going to move that hay. Instead of taking the usual six or seven circles, I cut it down to four or five just to save on twine, because I am not going to do nothing anyway.

JUDGE LAWRENCE: Based on your experience, what is the average length per pound which you utilize?

THE WITNESS: I would say that it was somewhere around 500 feet.

This witness further testified that a variance in twine of 100 feet would be noticeable to a person using it; and that an increase in thickness would occasion far more trouble than a twine which is thinner than usual.

Plaintiffs' witness J. Fred True is the state sealer, or director of weights and measures for the Board of Agriculture in the State of Kansas. It is the function of his office to test agricultural twine to determine the variation, if any, from the per-pound footage stated on the package, since a variation in excess of 4 per centum is a violation of Kansas law. His reports (plaintiff's exhibits 10–14) show that, in many instances, twine represented to be 500 feet per pound tested more or less, and in excess of a tolerance of 5 per centum.

This witness testified that he is familiar with binder twines used in Kansas; that such twines are chiefly used in that state in the Allis-Chalmers Roto baler; that Kansas is one of the leading states in the country in the use of binder twine; that the fact that twine might run less than 475 feet to the pound would not prevent its being used in the Roto baler; and that if it runs as low as 352 feet per pound, it would still be usable as binder twine, although "It might not be practical from the purchaser's standpoint."

Edmund M. Stone, one of the partners of plaintiff Bob Stone Cordage Company, testified that the merchandise which his company ordered from the Mexican manufacturer was binder twine and baler twine, but he had no personal knowledge of what twine was supplied in fulfillment of his order. All twine which he imported was sold through distributors and wholesalers all over the United States. It is, however, used mostly in the Middle West, as far south as Texas and New Mexico, as far north as Wisconsin, Minnesota, Montana, and the Dakotas, and as far east as Indiana and Ohio.

Stone's personal experience in the use of binder twine dated back to 1910. It involved a very thorough knowledge of both automatic

hay balers and grain binders, but was limited in geographical area to Iowa and northern Missouri. Elsewhere, he had no occasion to see how any particular shipment was used by the customers of his dealers, who were primarily machinery and seed distributors. He testified that all of the Ozark brand twine which he imported was sold to and distributed by the witness Mansfield; that all of the Blue Circle, and Champion twine, as represented by plaintiffs' exhibits 19 and 20, respectively, was sold as binder twine; and, in the area where he had seen it used, about 95 per centum went into automatic hay balers, the remainder in corn and grain binders, of which there were not too many left in the Middle West any more.

Stone further testified that a Roto baler, which ordinarily uses binder twine, could produce a bale of hay with baler twine; that baler twine could be used in corn and grain binders; that a farmer would not know or be affected by the fact that a ball of twine ran as low as 350 feet per pound; that if his firm received such underfootage twine, he would complain to the manufacturer, since binder twine is "supposed to have an average of 500"; that, to his knowledge, he has never ordered, received, or sold twine of less than 500 feet; and that he never received any complaints from any source with respect to binder twine.

Donald McElvain, bookkeeper and farm manager for Bob Stone Cordage Company, testified that he saw the following: A bale of hay, baled on an Allis-Chalmers Roto baler, using baler twine (plaintiffs' exhibit 21); a bale of hay, baled on an Allis-Chalmers Roto baler, with a heavy 1-ply sisal twine (plaintiffs' exhibit 24); a bundle of corn fodder, bound in a John Deere corn binder, using a heavy 1-ply sisal twine (plaintiffs' exhibit 25); a bundle of corn, tied by a John Deere binder with baler twine (plaintiffs' exhibit 26); and that no difficulties were experienced by those machines in operating with such twines; nor were any adjustments necessary; but that these were experiments made for the purposes of this case.

Robert Godnick, vice president of New York Twine Corp., one of the ultimate consignees of the twine in issue, testified that the shipment covered by protest 307886–K was the second half of an order for agricultural baler and binder twine placed with Cordeleria de San Juan (plaintiffs' exhibit 27), the initial shipment having been passed free of duty as binder and baler twine. It was a brand, marked Hi Glo, and both shipments were sold to agricultural implement or feed dealers, from whom he did not receive any complaint whatsoever. All of the Hi-Glo twine was ordered as 500-foot twine, and he did not know whether or not that was what he had received.

This witness further stated, under questioning by the court, that there are types of baler twine running as low as 180 feet to the pound and as high as 257 feet, but that he would not accept as good

delivery for baler twine anything between 350 to 450 feet per pound. As regards binder twine, he admitted that 500-feet-per-pound is standard in the trade, but believed that a person using twine of a footage of 400 or 450 feet per pound would not actually know the difference. However, he agreed that if a farmer knew that his twine were running 350 rather than 500 feet to the pound, he would not be satisfied with it.

Godnick also testified that, in purchasing twine, it was not his expectation that every ball in every shipment would measure a standard length. "We always say average feet per pound, average strength and such, because we know that twine carries variables," and it is recognized that there may be substantial variations from that average.

Measured in the light of the essential elements comprising a *prima facie* showing of chief use, it must be said that the instant record is found wanting. It is immediately apparent that none of the witnesses concerned with the manufacture and distribution of the instant merchandise had any direct knowledge of its length per pound, or of the fact that any binder twine marketed in this country fell substantially below the acknowledged standard of 500 feet to the pound. As a consequence, their testimony with respect to the use of so-called underfootage binder twine was inherently speculative. They could, and did, assume that the Allis-Chalmers Roto baler would operate efficiently and without adjustment on twine substantially less than the standard length per pound, but were forced to acknowledge that it would not be economically practicable for farmers to use it. Moreover, they could not assert that twine of any of the lengths of the subject merchandise had ever been put to any actual use in farming operations for binding purposes. As a matter of fact, it is fairly inferable that much of the testimony related to the use of recognized average length binder twine, not shown to embrace underfootage material.

Moreover, while it was established that the principal area in the United States for the consumption of binder twine was the entire Middle West, no one of the witnesses observed the use of any kind of binder twine outside the States of Nebraska, Oklahoma, Kansas, Arkansas, Missouri, and Iowa. Assuming *arguendo* that a Roto baler will function, regardless of the length per pound of the twine it uses, the record does not show whether in the remaining predominantly agricultural sections of the country the Roto baler displaced the grain binder as the chief consumer of binder twine, nor what effect, if any, underfootage twine would have when used in grain binders. In this connection, the following testimony of Mr. Godnick, in response to questioning by the court, is revealing:

JUDGE FORD: Conversely, would you accept for good delivery binder twine, for a pound of binder twine, a footage that was less than 500 feet subject to the

5% tolerance? Would your firm ordinarily buy that; would you order it at 400 feet?

THE WITNESS: No, I would order it at 500 because it is the standard in the trade.

JUDGE FORD: And that is used by the trade and commerce?

THE WITNESS: Yes, sir.

JUDGE FORD: In other words, they must have had a reason for wanting it to be 500 feet.

THE WITNESS: At the time originally, they did, yes, sir.

JUDGE FORD: Do you know, based upon your active experience in your business, of any twine of the size of 300 feet, 350 feet, 360 feet, 380 feet, 400 feet, 450 feet; do you know of any place in the United States where twine of that length is used for agricultural purposes? Do you sell it for agricultural purposes?

THE WITNESS: No, sir, but I would like to qualify that. If this were being sold at that footage of 400 or 450 feet per pound, I doubt that I, as a twine man, or the person using that twine, would actually have known the difference, * * *.

It would seem of no great moment that the distributors of the instant merchandise never received any complaints about it from any of their customers. In the absence of proof of its ultimate use, it does not follow that such merchandise, nor twine of substantially the same character, was actually consumed in farming operations for binding purposes.

Clearly, the evidence in this case fails to establish that twine in balls measuring less than 500 feet to the pound was a type of twine chiefly used in agricultural pursuits for binding purposes. Since this was the proposition which plaintiffs were required to sustain to bring their importations within the scope of the provisions for binding twine in paragraph 1622, their claims for free entry must be denied.

Judgment will be entered accordingly.