**MAHER-APP & CO. et al., Plaintiffs,**

**v.**

**UNITED STATES, Defendant.**

**C.D. 3429; Protest No. 274662–K/14611, etc.**

United States Customs Court,
Second Division.

April 29, 1968.

James J. Morrison, New Orleans, La., Glad & Tuttle, San Francisco, Cal. (Ed-

ward N. Glad, Los Angeles, Cal., of counsel), for plaintiffs.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Richard J. Kaplan and Sheila N. Ziff, New York City, trial attorneys), for defendant.

William Whynman, New York City, as amicus curiae.

Before RAO, Chief Judge, and FORD, Judge.

RAO, Chief Judge:

The protests here involved, which have been consolidated for purposes of trial, place in issue the tariff classification of certain imported merchandise, consisting of 5 or 8 pound balls of henequen or sisal twine, which was invoiced as binder twine. The collector of customs at the port of entry applied the provision for cords and twines in paragraph 1005(b) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T.D. 51802, and, accordingly, assessed duty upon these importations at the rate of 15 per centum ad valorem. Plaintiffs claim that said twine is entitled to free entry as binding twine, as provided in paragraph 1622 of the Tariff Act of 1930, as amended by Public Law 82–219, 65 Stat. 655.

The statutory provisions relevant to this dispute are as follows:

Paragraph 1005(b) of the Tariff Act of 1930, as modified by said general agreement:

Cords and twines (whether or not composed of three or more strands, each strand composed of two or more yarns), tarred or untarred, single or plied, wholly or in chief value of manila (abaca), sisal, henequen, or other hard fiber ........ 15% ad val.

Paragraph 1622 of the Tariff Act of 1930, as amended, supra:

All binding twine and twine chiefly used for baling hay, straw, and other fodder and bedding materials, manufactured from New Zealand hemp, henequen, manila, istle or Tampico fiber, sisal grass, or sunn, or a mixture of any two or more of them, of single ply and measuring not exceeding seven hundred and fifty feet to the pound ..................... Free

In light of the above statutory language, the principal issue raised in this case is whether the instant importation covers such twine as falls within the description "binding twine". Thus expressed, the question is not new to customs litigation. It has been the subject of several controversies arising under the Tariff Acts of 1922 and 1930 and was explored at length in the cases of United States v. Geo. Wm. Rueff, Inc., 41 CCPA 95, C.A.D. 535; Bob Stone Cordage Co., et al. v. United States, 51 CCPA 60, C.A.D. 838; Geo. Wm. Rueff, Inc. v. United States, 72 Treas. Dec. 290, T.D. 49151; Independent Cordage Co., Inc. v. United States, 3 Cust.Ct. 157, C.D. 223; Alberto Vales v. United States, 9 Cust.Ct. 219, C.D. 698.

In United States v. Geo. Wm. Rueff, Inc., supra, the Court of Customs and Patent Appeals affirmed the comprehensiveness of paragraph 1622 by holding that importations of baler twine, running about 200 feet to the pound and chiefly used for baling hay, came within the scope of the provision for "all binding twine". In the course of its decision, the court indicated that paragraph 1622 would encompass all twine made from the numerated raw materials which did not exceed the statutory maximum of 750 feet to the pound and was chiefly used in the agricultural pursuits of tying grains or harvesting.

In Bob Stone Cordage Co., et al. v. United States, supra, our appellate tribunal affirmed the overruling of a protest which claimed that merchandise invoiced as "binder twine" was such twine as came within the purview of para-

graph 1622, on the principal ground that plaintiffs had failed to show that the uses of the imported twine were chiefly agricultural. The court's finding was predicated upon a number of factors. First, plaintiffs' witnesses testified that twine which fell more than 5 percent below 500 feet to the pound would not be acceptable as binder twine. Second, reports from government chemists that samples of the merchandise in issue measured from 352 to 473 feet per pound were not disputed. Third, none of the witnesses could testify that the merchandise in issue conformed to the acknowledged standard of 500 feet per pound, nor could they state that nonconforming twine would consciously be used for binding purposes in farm operations. The court also was of the opinion that the witnesses lacked familiarity with the disputed importation and that the testimony concerning other binder twine did not cover a geographical area broad enough to support a showing of chief use.

It thus appears that the major defect of plaintiffs' proof in the *Bob Stone Cordage* case was a failure to relate the testimony of their witnesses to the importation at issue, which, by virtue of the only available measurements, must be presumed to have been of a variety yielding less than 475 feet per pound and, hence, of a class or kind other than standard binder twine.

Plaintiffs here, faced with satisfying the evidentiary burden which had proven too great for the plaintiffs in the *Bob Stone Cordage* case, offered an impressive array of witnesses. They were as follows: Mr. V. J. Peuler, customs line examiner at the port of New Orleans, who handled twine and cordage for 2½ years and who advisorily classified the twine on all the entries involved herein except those covered by two of the protests; Mr. A. E. Hodapp, chemist and chief of the Organic Division of the United States Customs Laboratory in New Orleans; Mr. Mixel J. Jacobo, foreign sales manager for Cordemex, an organization of Mexican cordage manu-

facturers in Merida, Yucatan; Mr. Carl L. Ruch, owner of the Cordtex Company, a customer of Cordemex and supplier to wholesalers and large farm implements and farm food retailers; Mr. Robert D. Munch, president and general manager of Pan American Products Corporation; Mr. Edmond D. Stone, an officer of the Bob Stone Cordage Company; Mr. Joseph A. Parra, manager of said firm's New Orleans office; Mr. Wayne DeNeal, manager of the twine department of the Graham Paper Co.; Mr. James L. Dodds, president of the Dubuque Twine Company; Mr. Richard O'Dell, manager of the Cordage department for Van Waters & Roger; Mr. Paul Hal Smith, division manager for Birmingham & Prosser Company; and Mr. Robert H. Montgomery, vice president and general manager of the Denver-Omaha Division of Schermerhorn Brothers, Incorporated.

The testimony of these witnesses with regard to recognized binder twine touched on four areas: The events surrounding the classification of the twine, the manufacture and physical characteristics of the twine, the merchandising of the twine, and the use of the twine.

With reference to the classification process, as it related to the disputed twine, plaintiffs called the line examiner, Mr. Peuler, in an attempt to elicit those factors which led him to deny duty-free status to these items. Although he handled the merchandise in six of the eight protests consolidated herein, Mr. Peuler was unable to recall the details of these proceedings or to state to what extent the lengths per pound reported by the customs laboratory were determinative of his advisory classification.

It was developed from the testimony of Mr. Hodapp that samples of items invoiced as binder twine were sent to the customs laboratory to be analyzed under his supervision, for weight, oil content, and length per pound. The reports of the United States Customs Laboratory attached to the invoices on the entries involved herein reveal that the lengths of the sampled balls ranged from 379 to 473 feet per pound. Mr.

Hodapp stated that certain balls of twine, introduced in evidence as plaintiffs' illustrative exhibits 1, 2 and 3, possessed general characteristics similar to those which he associated with items invoiced as binder twine and examined in his laboratory.

Plaintiffs' illustrative exhibits 1, 2 and 3, together with exhibits 4 and 5 introduced later, were accepted in evidence by the court as representative of the general characteristics of that class of goods acknowledged as binder twine. The exhibits were not, however, samples of the importation, nor was their length-weight ratio established.

Regarding the manufacture and physical characteristics of binder twine, Mr. Jacobo, the foreign export manager of Cordemex, testified that binder twine is a single ply twine made of sisal or henequen fiber, oiled, treated with rodent and insect repellent, and manufactured to yield 500 feet per pound. The nature of the manufacturing process is such, however, as to make fluctuations in the length-weight ratio unavoidable. The full details of the manufacturing process were summarized by this court in Bob Stone Cordage Company et al. v. United States, 48 Cust.Ct. 169, C.D. 2331, and it serves no useful purpose to repeat them here. According to Mr. Jacobo, the end product of the manufacturing process is a binder twine sold in two forms, as an 8 pound ball in packages of six, or as a 5 pound ball in packages of ten.

The physical characteristics of binder twine testified to by the other trade witnesses comported with those mentioned by Mr. Jacobo. That is to say, these gentlemen, when ordering binder twine, expected to receive a single ply twine, oiled and treated with rodent, insect, and rot repellent and yielding approximately 500 feet per pound. They also indicated that the illustrative exhibits conformed in appearance to the binder twine which they ordered.

The nine witnesses who were involved in the importation and sale of binder twine were in substantial agreement regarding the ordering and merchandising of said twine. They ordered binder twine with the understanding that they would receive 500 feet per pound and that any variation in the length per pound greater than 5 percent would not satisfy the normal requirements.

The background of these standards is detailed in the cross-examination of Mr. Ruch of the Cordtex Company.

Q. And in 1948, do you recall how you ordered binder twine from Mexico? —A. Just as binder twine. We were never specific as to a yardage at that time. Binder twine was generally accepted and supposed to be 500 foot spinning. That's what the trade always knew it as.

Q. When you ordered binder twine then at that time, you expected to receive merchandise that was approximately 500 feet per pound?—A. Averaging 500 feet per pound.

Q. And if you knew that the merchandise measured 400 feet per pound or 350 feet per pound, are you telling us this morning that you would accept that merchandise of only 350 feet per pound or 400 feet per pound in place of the merchandise of approximately 500 feet which you ordered?—A. Well, I would perhaps in some instances, depending upon the customer, conditionally accept it provided the customer knew what he was getting, and a corresponding adjustment in price was made to compensate for the fact that it wasn't what he generally expected to receive.

It appears that those who imported the twine in question did not examine it and simply allowed it to enter their usual channels of commerce. None of the commercial witnesses could testify that they had inspected the twine contained in those shipments with any degree of thoroughness. They had not individually handled, smelled, weighed, or measured the balls which were contained in those of their shipments which are covered by the protests consolidated herein.

The witnesses testified that the instant twine was entered into the same commercial channels whether or not it was accorded duty-free status. The sales of this twine were made to twine wholesalers, large retailers, farm implement and feed dealers, and organizations of farmers.

Extensive testimony was offered regarding the ultimate use of twine entered in the above-mentioned channels. The nine witnesses connected with its importation and sale were in agreement that it was used on the farm for the binding and tying of grains. They based their statements either on the fact that the channels in which they sold their twine were such as catered to the needs of farmers or on the actual observation of binding twine in use in roto baler machines in the course of their business travels. The area covered by such observations extended over the full length and breadth of the major farm areas of the United States. Mr. DeNeal, for example, testified that he saw binder twine in use in a number of Midwestern States in the course of selling such twine to dealers and responding to complaints by consumers and that such twine resembled plaintiffs' illustrative exhibits 1 through 5. In addition, he knew of no use, other than agricultural, for such twine. When dealing in twine Mr. DeNeal stated that he expected such twine to yield 500 to 600 feet per pound.

Mr. Edmond D. Stone testified that he was familiar with the use of binder twine such as was similar to plaintiffs' illustrative exhibits 1 to 5, on his own and neighboring farms, and had seen such twine used in the South and Midwest, primarily in Allis Chalmers' rotary balers. He testified that he had found no other use for binder twine in the course of supervising its sale to wholesalers, distributors, and dealers. He stated that the binder twine which he dealt in was understood to yield 500 feet to the pound.

The remaining witnesses testified in a similar vein. Their familiarity with the use of binder twine was a result of their supervising its sale to wholesalers, distributors and farm supply houses in various sections of the country. The twine they sold, to the best of their knowledge, fulfilled the expected length-weight ratio of 500 feet per pound in addition to possessing the other enumerated physical characteristics. As stated previously, however, none of the witnesses could testify that they had ascertained the length per pound of the instant twine or that they had seen the instant twine in use on farms.

Plaintiffs urge that the authority of the witnesses, the scope of their expertise, and the weight of their testimony combine to establish that the instant twine is of that class or kind known as binder twine. Plaintiffs argue that it is the use of the class or kind which is determinative of chief use and not necessarily the chief use of the particular merchandise involved in the instant importation.

■ The court does not question the expertise of plaintiffs' witnesses or the soundness of the proposition that chief use of the class or kind is determinative. Pacific Guano & Fertilizer Co. et al. v. United States, 15 Ct.Cust.Appls. 218, T.D. 42240; United States v. Colibri Lighters (U.S.A.) Inc., 47 CCPA 106, C.A.D. 739. We draw a clear distinction, however, between the need to prove the chief use of the exact importation, which may be dispensed with, and the indispensable requirement that the instant importation be shown to belong to that class or kind concerning which proof of chief use is offered. We are of the opinion that plaintiffs have failed to fulfill the latter burden.

■ In this case, plaintiffs have marshaled an abundance of proof relating to binder twine in what can best be described as its commercially acceptable form. In this form, the twine is expected to possess certain physical qualities, among which is the requirement that it measure 500 feet per pound. The testimony reveals that this characteristic is expected by the importers, sellers, and ultimate users and is the standard

aimed for by the manufacturer. Consequently, it appears that the requisite yield of twine per pound is a major characteristic of binder twine as a class, absent which such twine will not be acceptable for the uses testified to by plaintiffs' witnesses. In short, the proper length per pound is an indispensable identifying characteristic of the class of twine known as binder twine. In light of this fact, the length of the instant twine becomes of central importance, not arising from the necessity of demonstrating that these particular shipments were used on the farm, but rather from the necessity of showing that the instant twine possesses those essential characteristics which the class possesses. In short, plaintiffs' failure of proof was in respect to showing that the instant twine belonged to the class of acknowledged binder twine, concerning which the witnesses possessed extensive knowledge.

We do not at this time need to determine just what variations in physical characteristics will remove twine from the class of binder twine and what variations will not effect an exclusion. It suffices here to state that the deficiency in length per pound has been shown to be a characteristic which removes the instant twine from the class of binder twine.

■ The only available proof concerning the length of the instant importations is contained in the customs laboratory report. It reveals that the samples measured less than 475 feet per pound. Accordingly, simply because the instant twine entered the same commercial channels as binder twine and aroused no complaints will not support an inference that it was of the required length for binder twine.

■■ The fact that those involved in the importation of the twine treated all such shipments in the same manner does not negate the existence of valid distinctions between twine which actually meets certain standards and that which fails to do so and is, hence, excluded from a class. This court must base its decision on the best information it can obtain as to the realities of business transactions and not necessarily on the suppositions and expectations of the parties to the transaction. It is plainly revealed that if the length per pound of the instant twine was known to be less than 475 feet it would not consciously be sold, bought, or used in the ordinary course of events.

Nor can we make an inference regarding length in light of the absence of complaints, since it was made plain that the length per pound can be determined only by unraveling a ball and thus destroying its usefulness in a roto baler; something the farmer is unlikely to do and something which the trade witnesses never did. It is significant, however, that there is evidence to show that farmers would not be satisfied with twine that measures less than the acceptable standard.

In sum, this court can find no basis for distinguishing the instant case from the *Bob Stone Cordage* case, supra. In that case, plaintiff was faced with the burden of proving that the imported twine, of an established length per pound less than 475 feet, was nevertheless of the class of binder twine chiefly used in farming operation. In holding that it was not, the court stated (C.A.D. 838):

As pointed out by the court below, no witness concerned with the manufacture and distribution of the imported merchandise had any direct knowledge of its length per pound, or of the fact that any binder twine marketed in this country fell substantially below the acknowledged standard of 500 feet per pound. They acknowledged that it would not be economically practical for farmers to use twine substantially less than the standard length per pound in baling hay with roto balers. There was no proof that twine of the proven measurements of the imported merchandise had ever been used for binding purposes in farming operations.

The above quoted critique applies with equal aptness to the evidence assembled by plaintiffs in the instant case. The

witnesses were competent to discuss the class of binder twine and show that it was chiefly used on the farm, but they failed to support the contention that the importation was within the purview of that class.

Failing that, plaintiffs offered no proof that twine possessing the characteristics of the importation, particularly the deficient length per pound, was nevertheless chiefly used on the farm. The testimony, in fact, tends to support the opposite conclusion; that were its deficiencies of length known, the imported twine at issue would not be used as binder twine.

In conclusion, therefore, we hold that the presumption of correctness attaching to the collector's classification is undisturbed, and the twine herein was properly classified under the provision for cords and twines in paragraph 1005 (b) of the Tariff Act of 1930, as modified, supra, and was correctly assessed with duty at the rate of 15 per centum ad valorem.

Judgment will be entered accordingly.